Arthur G. Klein, J.
The interesting question presented for decision is the right of a producer, in the absence of specific contractual provision, to prevent, by injunction, minor cuts in his motion picture, when shown on television, and the usual breaks for commercials.
The litigation involves the production of the motion picture ‘ ‘ Anatomy of a Murder ’ ’.
The complaint alleges that plaintiff Preminger is a producer and director of motion pictures, including the motion picture involved; and plaintiff Carlyle Productions, Inc., a California corporation, was the owner of all rights to the picture, and Carlyle Productions, a limited New York partnership, its assignee; that Carlyle Productions, Inc., entered into a series of agreements with Columbia Pictures Corporation between 1956 and 1959, which are collectively referred to as the contract, copies of which are annexed to the complaint.
Defendant Columbia and defendant Screen Gems, Inc., its subsidiary, the complaint continues, have licensed over 100 television stations to exhibit the motion picture on television, and those license agreements purport to give the licensees the right to cut, to eliminate portions of the picture, and to interrupt the remainder of the picture for commercials and other extraneous matter.
Unless enjoined, the complaint asserts, defendants will (a) detract from the artistic merit of “ Anatomy of a Murder (b) damage Preminger’s reputation; (c) cheapen and tend to destroy “ Anatomy ”’s commercial value; (d) injure plaintiffs in the conduct of their business; and (e) falsely represent to the public that the film shown is Preminger’s film.
It is then alleged, and not denied, that “ Anatomy ” is one of a very few motion pictures with a rating of AA-1; that it has been licensed in blocks of 60 to 300 pictures; and that the others are artistically and commercially inferior to “Anatomy”.
Finally it is alleged that defendants have allocated an unfairly and unreasonably low share of license fees to “Anatomy”. This allegation is denied.
All these acts are described as willful and wanton breaches of the contract with Carlyle as owner and Preminger as producer.
Injunctive relief and accounting, for plaintiffs’ damages, are prayed for.
Specifically, it is demanded that judgment be granted: (a) enjoining defendants from performing their obligations under the licensing agreements; (b) enjoining defendants from entering into further agreements violative of plaintiffs ’ rights; *365 (c) enjoining defendants to withdraw all prints previously distributed; (d) directing defendants to account to plaintiffs, for what are presumably plaintiffs’ damages; profits are not requested; and (e) other and further relief.
Denying- generally the material allegations of the complaint, the answer set up three affirmative defenses: first, that the complaint is insufficient; second, that plaintiff Carlyle’s corporate predecessor, Carlyle Productions, Inc., a California corporation, not having been franchised to do business in New York in 1959 when the contract was entered into, may not sue on said contract in New York (General Corporation Law, § 218): and third, that an injunction would adversely affect the contract rights of United Artists Corporation and others, by virtue of an ancillary agreement; accordingly there is a defect in parties, and injunction will not lie.
Simultaneously with the service of the summons and complaint, the plaintiffs moved for a preliminary injunction. The motion was generally denied (Brust, J., Oct. 13, 1965), the court noting that defendants had undertaken not to cut the picture; based upon such undertaking, a consensual preliminary injunction was granted, preserving to defendants the right to interrupt for commercials.
On a subsequent motion by plaintiffs to compel and to shorten the time within which defendants might serve cross questions, pursuant to CPLR 3103, defendants cross-moved for separate trial, pursuant to CPLR 603. Both motions were granted (Murphy, J., Nov. 9, 1965); the order provided that the issues of plaintiffs’ right to recover money damages by virtue of defendants’ alleged failure to reissue the motion picture for theatrical exhibition, and their failure properly to allocate to ‘ ‘ Anatomy ’ ’ a sufficient amount out of their block sale, be severed from the injunction issue and be tried in normal course.
Thus, the only question before the court in this proceeding is the plaintiffs’ right to a permanent injunction.
I
The plaintiffs plant themselves upon article VIII of the contract, which provides: “ You [Carlyle] shall have the right to make the final cutting and editing of the Picture, but you shall in good faith consider recommendations and suggestions with respect thereto made by us [Columbia]; nevertheless, you shall have final approval thereof, provided however that notwithstanding- the foregoing, in the event that cutting or re-editing is required in order to meet censorship requirements and you *366 shall fail or refuse to comply therewith, then we shall have the right to cut and edit the Picture in order to meet censorship requirements without obligation on our part to challenge the validity of any rule, order, regulation or requirement of any national, state or local censorship authority.” The import of the paragraph is that plaintiffs have the right to make the final; ‘ ‘ cutting and editing ’ ’ of the picture; giving the defendants the. right to make suggestions, only.
This article must be read, however, in juxtaposition with article X of the contract, which provides as follows: “The rights herein granted, without limiting the generality of the foregoing, shall include and embrace all so-called ‘ theatrical ’ as well as ‘non-theatrical ’ rights in the Picture (as those terms are commonly understood in the motion picture industry); and shall include the right to use film of any and all gauges. You hereby give and grant to us throughout the entire world the exclusive and irrevocable right during the term herein specified to project, exhibit, reproduce, transmit and perform, and authorize and license others to project, exhibit, reproduce, transmit and perform, the picture and prints thereof by television, and in any other manner, and by any other means, method or device whatsoever, whether mechanical, electrical or otherwise, and whether now known or hereafter conceived or created.”
This article, it will be noted, which contains the specific grant of television rights, makes no reference to “ cutting and editing ”.
In these circumstances the court is inclined to the view that the right to the “final” cutting and editing, reserved to the plaintiffs, is limited to the original or theatrical production of the picture, and not to showings on television; and that as to such showings, in the absence of specific contractual provision, the parties will be deemed to have adopted the custom prevailing in the trade or industry.
This view is confirmed by the authorities and fortified by the evidence.
II
We begin with the proposition that the law is not so rigid, even in the absence of contract, as to leave a party without protection against publication of a garbled version of his work. This, as pointed out by Frank, J., concurring in Granz v. Harris (198 F. 2d 585, 589 [C. A. 2d, 1952] is not novel doctrine.
The court 1 ‘ appreciates that the failure of the community * * * to protect its gifted men of letters led to tragedies which comprise scars in the history of civilization ”. ( Geller, *367 J., in Seroff v. Simon & Schuster, 6 Misc 2d 383, 386-387 [N. Y. County, 1957], affd. 12 A D 2d 475 [1st Dept., 1960].)
And in Granz (supra) the United States Court of Appeals for the Second Circuit held that publication of a truncated version of plaintiffs’ phonograph recording should be enjoined (pp. 587-588).
In the case at bar, however, the contract must serve as a guide to the’ intention of the parties.
A
Thus, where the parties have particularized the terms of a contract, an apparently inconsistent geheral statement to a different effect must yield. (Petty v. Fidelity Union Trust Co., 238 App. Div. 96, 99-100 [2d Dept., 1933], affd. 262 N. Y. 690 [1933]; 1 Restatement, Contracts, § 236, subd. [c]; N. Y. Contracts Law, § 818.) Therefore, the clause in this contract, general in its terms, giving' píáintiffs the right to “ finally ” cut aind edit as to the original production of the motion picture, must yield to the specific clause with respect to television showing, which contained no such right.
B
So it is, too, that in the construction of a contract, weight will be given to the custom prevailing in the trade to which it refers. (Smith v. Clews, 114 N. Y. 190 [1889].)
This brings us to a review of the evidence, on which, of course, the burden of proof rests on the plaintiffs.
o
At the trial, extensive testimony was presented by both sides with respect to the normal customs prevailing in the television and motion picture industries as to the significance of the right to ‘ ‘ final cut ’ ’.
A review of the testimony demonstrates that, at least for the past 15 years, the right to interrupt the exhibition of a motion picture on television for commercial announcements and to make minor deletions to accommodate time segment requirements or to excise those portions which might bo deemed, for various reasons, objectionable, has consistently been considered a normal and essential part of the exhibition of motion pictures on t (devision.
Implicit in the grant of television rights is the privilege to cut and edit. (Autry v. Republic Prods., 213 F. 2d 667, 669 [C. A. 9, 1954], cert. den. 348 U. S. 858 [1954].)
*368 D
No proof has been adduced that this cutting and editing would be done in such a manner as to interfere with the picture’s story line.
The licensing agreements provide: ‘ ‘ Licensee shall telecast each print, as delivered by Distributor, in its entirety. However, Licensee may make such minor cuts or elimination as are necessary to conform to time segment requirements or to the orders of any duly authorized public censorship authority and may add commercial material at the places and of the lengths indicated by Distributor, but under no circumstances shall Licensee delete the copyright notice or the credits incorporated in the pictures as delivered by the Distributor, provided, however, in no event may the insertion of any commercial material adversely affect the artistic or pictorial quality of the picture or materially interfere with its continuity.”
Defendants’ witnesses, Lacey of WCBS, Howard of WNBO and Gilbert of WABC, testified with respect to the practices customarily prevailing throughout the television industry. Plaintiffs’ witnesses did not controvert the testimony concerning the customary practices in the trade with regard to interruptions for commercials, and minor cuts. As a matter of fact, ■Sherwin, one of plaintiffs’ witnesses, the program director of KHJ, Los Angeles, testified, as had defendants’ witnesses, that his station had never purchased any motion picture without the right to make interruptions as well as minor cuts. "Whether or not, in an isolated instance, a picture was exhibited with less than the customary number of commercials is not determinative of the issue. We are concerned not with what might have happened in some rare instance but instead with what was the common practice and custom at the time the parties herein signed their contract.
Thus, Yillante, a vice-president of the Batten, Barton, Durstine & Osborn advertising agency, described a program known as the “ Schaefer Award Theatre” which is handled by his advertising agency. This is a late show program in which feature films are shown without cuts, and with only four interruptions for commercial announcements. Yillante acknowledged repeatedly that the Schaefer program was unique. In one instance, he stated, a picture called “ The Nun Story” was shown on this same program without any interruptions for commercials whatsoever. He further testified that the purpose of deviating from usual industry practice in the case of this one program was not out of any concern for the rights of the producer, but rather as a public relations device to contribute *369 to the public image of the Schaefer Company, and pursuant to agreement with said sponsor.
With respect to the expression ‘ ‘ final cut ’ ’, sufficient testimony was adduced to indicate that this phrase, as used in article VIII of the contract, relates only to a phase in the production of the picture for theatrical showing and has no relation to the interruptions and minor cuts here under discussion. Even plaintiffs’ own witnesses identified the “ final cutting and editing ” of a picture as the last stage in its production for theatrical exhibition. (Emphasis supplied.)
III
Although plaintiffs consistently refer to the practice of interrupting and making minor cuts as “ 3p.utilati.0n ”, their own witnesses have conceded that the minor cuts customarily made in a television exhibition of a picture have such a minimal impact upon its over-all effect that these are rarely even noticed.
Undisputed is the fact that not a single television station has ever failed to insist upon the right to interrupt for commercials. Similarly unrefuted is defendants’ proof to the effect that no station ever purchased a motion picture without reserving to itself the right to interrupt for commercials and to make minor cuts.
IV
Plaintiff Preminger admitted that when he signed the agreement for “Anatomy of a Murder ”, he was aware that the practice of the television industry was to interrupt motion pictures for commercials and to make minor cuts. Aware of this practice, plaintiffs at the time the instant contract was signed nevertheless did not specifically provide for conditions other than those known to them to be prevalent in the industry.
Two contracts between Preminger and United Artists Corporation were received in evidence. These were contracts pertaining to “ Man With The Golden Arm ” and “ The Moon Is Blue ”, the last two pictures produced by Preminger prior to “Anatomy of a Murder”, which he made for Columbia. In both the contract for “ The Moon Is Blue ” and the contract for “Man With The Golden Arm”, clauses appeared which demonstrate that Preminger was aware of the prevailing practice in the television industry with respect to interrupting motion pictures for commercials and making minor cuts therein for normal television purposes. These contracts further show that when Preminger desired to prevent television distribution in the normal manner, he so provided.
*370 In the contract between the Carlyle corporation and United Artists Corporation, dated December 20, 1954, for ‘1 Man With Tile- Gulden Arm’’, it was expressly provided that United Artists’ right ‘‘ to make such changes, additions, alterations, ctits, interpolations and eliminations as may be required for the distribution of the picture in television” should be subject to the approval of producer.
In similar fashion, the contract with United Artists Corporation with respect to “ The Moon Is Blue ”, dated April 28, 1952, provided that United Artists ’ right ‘ ‘ to make such changes, additions, alterations, cuts, interpolations, and eliminations as may be required for the distribution of the picture in television ” should be “ subject to the approval of Producer or its sales representative ’ ’.
Both Preminger and United Artists were aware that granting the producer this right of approval was tantamount to giving him a veto power over ultimate television distribution of the film, for in other provisions of both of the above contracts it was expressly recognized that television distribution was not to take place without the producer’s prior approval.
Plaintiffs’ entry into the instant contract which failed to contain such a clause may be considered by the court as evidence of the parties’ intention. (Cf. Atterbury v. Bank of Washington Hgts., 241 N. Y. 231, 237 [1925]; Metropolitan Exhibition Co. v. Ewing, 42 F. 2d 198, 202 [N. Y., 1890]; Broadway Maintenance Corp. v. City of New York, 19 A D 2d 96 [1st Dept., 1963].)
V
Should a viewer resent the fact that the film is interrupted too often for commercials, and assuredly many do, this resentment would be directed at the station or the sponsor of the program. It is difficult to conceive how such resentment would be directed at the film’s producer or director.
So standardized has the practice of interrupting films for commercials become, that guidelines have been established in the television, industry as to the maximum number of commercials regarded as acceptable in a given time period,
VI
The television industiy serves a great public need and its services have ofttimes, and perhaps at some financial sacrifice, been offered In the public interest. Despite such apparent unselfish public service, it should not be overlooked that the industry, like every other business, has as its primary objective *371 the accumulation of profits. Sponsorship of programs, by advertisers, provides a station with its only source of revenue and though it oftthues interrupts its programs with what some viewers feel to be an inordinate amount of advertising, since its primary purpose is to advertise the products of its sponsors, such interruptions in the absence of governmental or industry regulation can only be controlled by contractual arrangement.
It is of no import that some viewers may not approve of the advertising practices prevalent in the industry — that is, the number and types of commercials. However, the parties to this distribution agreement signed it knowing of the existence of such practices. The plaintiffs, as well as any independent producer or director, could have obviated this problem by specifically prohibiting such cuts or interruptions by contract. This, of course, might have had an adverse effect on the extent of television distribution — an eventuality which most producers would not welcome. Accordingly, in the absence of any contractual provision to the contrary, they must be deemed to have contemplated that what was permissible, under the existing practice, would continue in effect.
VII
The criterion for the determination of what the defendants were likely to do with respect to interrupting and cutting the subject film, in the absence of a specific contractual arrangement, was not what plaintiffs might disapprove of or dislike but, rather, what was the normal custom and practice in the industry.
The issues in the case, in the court’s view, are therefore issues of law: i.e., (1) whether plaintiffs may thwart the making of minor cuts or interpolations in the absence of specific contractual provision; the court finds the answer to this question to be in the negative; and (2) whether, under this contract, in the light of the custom in the trade, plaintiffs left to the station masters the right to use their judgment and exercise their discretion, instead of plaintiffs’, as to which minor cuts, eliminations, and interpolations are appropriate. In view of the variety of stations, localities, audiences, and commercials, the court answers this question in the affirmative.
The running time of the full motion picture is 161 minutes. The brochure for WABC-TV advertised the picture to potential sponsors as a 100-minute feature. The station master, however, testified, and the court credits his testimony, that this was a mistake; that it was never intended to permit any such extensive cutting. This applies as well to the asserted cutting of the *372 picture to 53 minutes. Obviously such cuts would not be minor and indeed could well be described as mutilation. Should such “ mutilation ” occur in the future, plaintiffs may make application to this court for injunctive or other relief against such violation as they may be advised. (Autry v. Republic Prods., 213 F. 2d 667, 669: [“ We can conceive that some such cutting and editing could result in emasculating the motion pictures so they would no longer contain substantially the same motion and dynamic and dramatic qualities which it was the purpose of the artist * * * to produce ”]; Granz v. Harris, 198 F. 2d 585, supra.)
CONCLUSION
On this record, the court holds that plaintiffs have not sustained their burden of establishing their right to injunctive relief.
To the extent, therefore, that the complaint seeks an injunction, it is dismissed; but without prejudice, as heretofore indicated.
In view of the foregoing disposition, the court does not find it necessary to reach the affirmative defenses.
This constitutes the decision of the court, pursuant to CPLR 4213.
Counsel may call for their exhibits at chambers.
Judgment may be settled accordingly.