## (May 12, 1966)

■ OTTO PREMINGER et al., Appellants, v. COLUMBIA PICTURES CORPORATION et al., Respondents.

APPEAL from a judgment of the Supreme Court in favor of defendants entered January 28, 1966 in New York County, upon a decision of the court at a Special and Trial Term, without a jury, adjudging that the complaint be dismissed insofar as it sought an injunction.

Judgment affirmed.

RABIN, J. (dissenting). The trial court, at the outset of its opinion, purporting to state the "question for decision" stated as follows: "The interesting question presented for decision is the right of a producer, in the absence of specific contractual provision, to prevent, by injunction, minor cuts in his motion picture when shown on television and the usual breaks for commercials." Unfortunately, that statement does not present the "question" to be decided. It in effect states the court's conclusion. Whether there is an "absence of specific contractual provision" is the basic question to be decided and it may not be taken as a premise.

It is because I believe that there is a "contractual provision", reserving to the plaintiffs (producers) and to the plaintiffs alone, the right to make any cuts in the motion picture involved, that I dissent. Moreover, the question presented does not involve the right to make only "minor cuts" in the motion picture. It is the assertion by the defendants (distributors) of the right to authorize unrestricted cuts — not merely "minor cuts" — that is put in issue by this lawsuit. The refusal to grant the injunction sought by the plaintiffs permits any television stationmaster, at will, to cut this picture down to the nebulous point, which the trial court calls "mutilation". It is also because I believe that such cutting is exactly what the contract seeks to guard against, that I dissent.

So let us start at the beginning rather than at the end. Is there a contractual provision with respect to cuts when the picture is shown on television?

The defendants are not the owners of the picture to do with it as they will. Ownership still lies with the plaintiffs. The defendants have only those rights — broad as they may be — as are given to them by the contract, subject, however, to whatever limitations the contract contains. Generally, the rights granted to defendants are the rights of distribution and exhibition, and those rights are contained in the main in Article 10 of the contract. The limitation with which we are chiefly concerned is contained in Article 8. In that article "the right to make the final cutting and editing of the picture" is reserved to the producer. That the distributor does not have the right to cut, or authorize cuts, in this picture, is conclusively demonstrated by the single exception contained in the same article which allows the distributor to cut or re-edit the picture, but only when it "is required * * * to meet censorship requirements and you [producer] shall fail or refuse to comply therewith". That article is as plain as plain can be. It states in simple language that with the single exception referred to, the distributor has no right to cut the picture, but that such right is reserved exclusively to the owner. We note what the trial court said in its opinion: "The import of the paragraph is that plaintiffs have the right to make the final 'cutting and editing' of the picture; giving the defendants the right to make suggestions, only."

How can it then be said that there is an "absence of specific contractual provision" preventing cuts in the motion picture by anybody but the producer when the picture is shown on television? To arrive at that conclusion the court directs us to Article 10 of the contract which it says must be read in juxtaposition with Article 8. Of course, these two paragraphs must be read together. But how does Article 10 lead us to the conclusion reached by the court "that the right to the 'final' cutting and editing, reserved to the plaintiffs, is limited to the original or theatrical production of the picture and not to showings on television"? The answer advanced by the court is that "This Article [10], it will be noted, which contains the specific grant of television rights, makes no reference to 'cutting and editing.'" It should also be noted that the same Article 10 contains "the specific grant" of theatrical rights without making "reference to cutting or editing." And yet, that the defendants have no right to cut when the picture is exhibited as a theatrical production is not only conceded but found by the court. There is no distinction appearing in Article 10 — or for that matter elsewhere in the contract — between the rights granted to the distributor for television and those granted for theatrical production. To be sure, Article 10 must be read together with Article 8. Reading them together we must find that the reservation of cutting rights in the producer, found in Article 8, applies to television production, as well as theatrical — Article 10 making no distinction between the two.

How then can cutting rights be found in the distributor in television production when, concededly, there are no such rights in theatrical production? The trial court relies on "custom prevailing in the trade and industry." It recognizes, however, that only in the "absence of specific contractual provision" may we consider custom. But here we do have a contractual provision and, consequently, there is no room for proof of custom contrary to such provision. While perhaps proof of custom may be availed of to explain the meaning of the words "cutting and re-editing" — although I think those words are plain enough — there certainly can be no allowance of testimony with respect to who should do the cutting or re-editing. The contract speaks clearly on that point — and that is the chief point in controversy. Custom, therefore, may not be used as a foundation for a finding that the distributors have a right to cut this picture at will in the face of the specific provision in the contract to the contrary.

However, testimony by an expert witness — of dubious qualification — was admitted in an attempt to prove a prevailing custom with respect to cutting in television production. But that witness did not testify that there is any custom prevailing where the parties have a contractual provision, such as we have here. Whatever the custom of the trade may be in other circumstances, it is of no force here, where the parties made their own provision with respect to the cutting rights.

The defendants introduced two agreements signed by the plaintiff Preminger with the United Artists prior to the signing of the contract in suit as " cogent evidence of Preminger's awareness of trade usage at the time." Examination of those two contracts proves an awareness by Preminger but one quite different than the one the plaintiffs try to show.

At the outset, it should be noted that the contracts referred to are contracts on printed form. The paragraph on which the defendants rely is paragraph 19. The printed form, before interlineations were made, expressly gave to the distributor the right to make cuts in television productions. The language is as follows: " United shall also have the right to make such changes, additions, alterations, cuts, interpolations and eliminations as may be required * * * for the distribution of the Picture in television ". If by custom, a distributor had the right to make television cuts, why the necessity to set forth expressly such rights in these form contracts? Paragraph 19 clearly indicates that it was on contract and not on custom that the distributors relied to make television cuts. The contracts being on printed forms indicate that they were in general or frequent use, pointing to a general recognition for the necessity of a specific grant to permit television cutting.

However, the defendants point to the interlineation of the words " subject to the approval of producer or its sales representatives ", saying that such interlineation really makes the clause one forbidding cutting in television and conclude that not having inserted a similar clause in the contract here involved, Preminger must be deemed to have agreed to cutting rights in the distributor. The defendants arrive at the wrong conclusion. Not wishing to give the distributors unqualified rights of television cutting the producer inserted the interlined words to make the printed form conform to his wishes. Leaving that clause out of the contract in suit does not justify a conclusion that by doing so the producer did give the distributor the right to make television cuts. There was no point in including the clause of grant and then nullifying it by interlining words of withdrawal.

Leaving Paragraph 19 out of the contract in issue is a clear indication that the producer did not wish to give the distributor any cutting rights whatsoever — not even the limited one contained in paragraph 19. Besides, leaving paragraph 19 out of the present contract did not leave a void with respect to cutting rights. Article 8, reserving to the producer all cutting rights without limitation, is in place and stead of paragraph 19. The United Artists' contract and this contract indicate that the producer was of one purpose — to retain cutting rights exclusively in himself, even with respect to television production. That purpose was clearly indicated in the United Artists' contract, which expressly reserved the right of approval in proposed television cutting in the producer and in this contract, which reserves to the producer all rights of cutting. The United Artists' contract is " cogent evidence of Preminger's awareness " — an awareness of the necessity of protecting himself by withholding from the distributors the right to cut the film in theatrical and television production alike.

Now let us apply the defendants' reasoning conversely. It appears that in a great percentage of Columbia contracts, where the distribution grants

are given Columbia in words almost identical with those of Article 10 of this contract, there appears a clause specifically reserving to Columbia the following: "The right in our sole discretion to cut, recut, edit, re-edit, and reassemble the Picture or any part or parts thereof". Shall we not say that the failure of Columbia to insert a similar clause in this contract points to no right in Columbia to make the cuts as it usually reserved for itself in other contracts? Perhaps we could and perhaps we should.

In support of the defendants' position they point to that portion of Article 10 giving them the right to "distribute and otherwise * * * deal in or with the Picture and all rights therein of every kind and nature, and prints or any part thereof". They seize upon the words "or any part thereof" and seem to tangentially argue that these words give to the distributor the right to make cuts in television productions. Of course, the clause quoted and the words indicated apply to theatrical as well as television productions, there being no distinction made between the two. If the defendants be correct in their conclusion with respect to television, then they must take the same view with respect to theatrical productions. That they do not do and cannot do because it would make the reservation of cutting rights in the producer, appearing in Article 8, absolutely meaningless. Therefore, they expressly claim no right in the distributor to cut theatrical productions despite the words "or any part thereof".

Reading Article 10, together with Article 8, as we are told we must, the only meaning we can gather from those words is that the producer parts not only with the right to exhibit or distribute the whole picture, but also parts with the right to exhibit or distribute any part thereof in the event the picture should be cut in the manner permitted by Article 8, i.e., by the producer. In other words, no right to exhibit or distribute remains in the producer with respect to the picture — not even in part. Reading the clause in that manner puts it in harmony with the rest of the contract and not at odds with it, as would appear if we would construe it as the defendants would have us do.

We must conclude that there is no way of finding a right in the distributor to cut or authorize cuts in the picture when it is exhibited on television, unless we write such a provision into the contract. That, the parties failed to do and apparently the producer refused to do, and, that the court may not do — particularly when the contract speaks so clearly against such a right.

The distributors not having such right, they should be enjoined from exercising any such claimed right.

Giving the plaintiffs the rights to subsequently apply for an injunction in the event that there should be "mutilation" of the picture in the future, gives the plaintiffs no rights they did not always have quite apart from those reserved to them by the contract. To allow any one of the 103 television stationmasters to whom these defendants purport to have given the right to cut and delete parts of this picture at will to a point short of "mutilation" in order to meet their station requirements is to deprive the producer not only of his contract rights but also of his common-law right to have the picture shown as he produced it. Particularly so when the contract requires that Preminger be identified as the producer and distributor in every exhibition of the picture. The exhibition of a garbled version under Preminger's name should by all means be enjoined (*Granz* v. *Harris*, 198 F. 2d 585).

In addition, the plaintiffs seek to prohibit the uncontrolled interruption of the exhibition of the picture for commercials. The producer made no provision in the contract for protection in that respect, as he did in connection with cutting. Nevertheless, it is conceivable that unlimited interruptions for commercials might tend to permit of a mutilated presentation of the picture to

834

the detriment of the common-law rights of the producer. Perhaps then the plaintiffs are entitled to some relief in that respect. The court concluded that commercials have become so "standardized * * * that guidelines have been established in the television industry as to the maximum number of commercials regarded as acceptable in a given time period." However, those guidelines are just guidelines and do not give the plaintiffs adequate protection because they may be followed or disregarded by exhibitors at will. I appreciate the difficulty in fashioning proper relief, but difficulty in doing so does not justify the failure to give any relief. Accordingly, I would remand this phase of the case for the court to make such provision as may be deemed sufficient to assure against interruptions by commercials to the extent that they would destroy the picture.

Finally, the plaintiffs seek an injunction against defendants' violation of contractual provisions regarding group sales of the movie. The provision in question reads as follows: " [Columbia may] distribute the Picture singly or in a group including other pictures, (except that we [Columbia] have the right to sell the Picture in the United States singly or on double feature programs)."

This contract provision might be considered ambiguous and in the circumstances parol evidence was properly received to determine its meaning. The evidence offered by the plaintiffs convinces me that the picture may not be sold in the United States as part of a group of pictures, and it supports a finding that the film may only be sold " in the United States singly, or on double feature programs." Due to the difficulty in establishing damages by attempting to allocate to this motion picture its fair proportion of the price derived from group sales, it is my feeling that injunctive relief is proper.

Breitel, J. P., McNally, Stevens and Steuer, JJ., concur in decision; Rabin, J., dissents and votes to reverse in opinion.