**JOHN HANCOCK MUTUAL LIFE INSURANCE CO., etc.,
Plaintiffs-Appellants,**

v.

**CAROLINA POWER & LIGHT COMPA-NY and Irving Trust Company,
Defendants-Appellees.**

Cal. No. 1414, Docket 83–7079.

United States Court of Appeals,
Second Circuit.

Argued June 16, 1983.

Decided Aug. 31, 1983.

Cahill, Gordon & Reindel, William E. Hegarty, R. Anthony Zeiger, H. Richard Schumacher, New York City, for plaintiffs-appellants.

Reid & Priest, Louis H. Willenken, John M. Stuart, Peter C. Williams, New York City, for defendants-appellees.

Before VAN GRAAFEILAND, PIERCE and WISDOM,* Circuit Judges.

WISDOM, Circuit Judge.

This is a diversity action for breach of contract or, alternatively, for reformation of the contract. Nineteen insurance companies, purchasers of bonds from Carolina Power & Light ("CP & L"), challenge CP & L's special redemption of those bonds with cash from a special maintenance fund provided for in the mortgage securing the bonds. The plaintiffs contend that CP & L breached an agreement not to redeem the bonds for ten years using borrowed funds with a lower effective interest rate than that provided for in the bonds. We conclude that the district court correctly rejected the plaintiffs' contentions and dismissed their complaint.

I. Background

A. The Sale of the Bonds.

CP & L is an investor-owned North Carolina electric utility serving large parts of North and South Carolina. Like most utilities, CP & L obtained most of its financing through the issuance of series of first mortgage bonds either in underwritten public offerings registered with the Securities and Exchange Commission or in unregistered private placements, as was the case here. On December 31, 1974, and January 23, 1975, CP & L sold $50,000,000 of its First Mortgage Bonds, 11⅛% Series, due 1994 (the "Bonds") to John Hancock Mutual Life Insurance Company and twenty-two other insurance companies ("Hancock")[1] in a private placement not registered under the Securities Act of 1933. Irving Trust Co. ("Irving"), also a defendant, served as corporate trustee for the issuance under a mortgage and deed of trust which secures bonds issued by CP & L.

The terms of this sale were contained in a series of documents. In November 1974, CP & L issued its Summary of Proposed Terms ("Terms Sheet"), a one-page document soliciting expressions of interest in the Bonds and indicating that the Bonds would be "non-refundable for 10 years with borrowings having a lower effective interest cost than the bonds". The non-refundability provision of the Terms Sheet was repeated in a letter ("Letter of Agreement") exchanged on December 16, 1974 between CP & L and Hancock, which bought $25,000,000 of the issue. This letter, however, clearly stated that the parties were "not attempting in this letter to prepare a definitive contract of purchase nor otherwise to define all the substantive terms of the transaction."

CP & L and Hancock then negotiated a formal Purchase Agreement and a Supple-

---

* Senior Circuit Judge of the Fifth Circuit, sitting by designation.

1. Of the twenty-three purchasers, nineteen are party to the lawsuit. Two additional purchasers, Unionmutual Stock Life Insurance Co. of New York and The Franklin United Life Insurance Co., are parties to agreements with CP & L whereby they and CP & L have agreed to be bound by the outcome of this action. Two other purchasers, Pilot Life Insurance Co. and Continental Western Insurance Co., chose not to participate in the action.

The other defendant is Irving Trust Co., the corporate trustee under a mortgage and deed of trust securing bonds issued by CP & L. D.W. May, the individual trustee under the mortgage indenture and an officer of Irving, was originally a defendant but was dismissed from the action after he agreed to be bound by its outcome.

mental Indenture ("Supplement") for this specific issue and sale of bonds. The Supplement was an exhibit to, bound with, and incorporated into, the Purchase Agreement dated December 17, 1974. The Purchase Agreement provides that the Bonds "shall be subject to redemption" as provided in the Supplement and that the bonds are "to be issued under and secured as provided" in the Mortgage and Supplement. The Mortgage under which CP & L issued the bonds contains various provisions to regulate the ratio of outstanding bonds to the security for those bonds. CP & L and various purchasers of its bonds negotiated the Mortgage in 1940, and the SEC approved the Mortgage and first bond issued under it in 1940. In re Carolina Power & Light Co., SEC Holding Company Act Release No. 2090, (June 5, 1940).

### B. The Relevant Details of the Agreements.

Various provisions in the Terms Sheet, Purchase Agreement, Supplement, and Mortgage are relevant to whether the special redemption was proper. Hancock relies on the Terms Sheet and Letter of Agreement to argue that CP & L agreed not to redeem the bonds for a ten-year period with funds borrowed at a lower interest rate. Hancock also refers to § 11 of the Purchase Agreement:

all agreements, representations, and warranties contained herein and otherwise made in writing by or on behalf of [CP & L] in connection with the transactions contemplated hereby shall survive the execution and delivery of this Agreement, any investigation at any time made by you or on your behalf, and the issue and

delivery to you of the bonds to be sold to you hereunder. All statements contained in any document delivered to you by or on behalf of [CP & L] in connection with the transactions contemplated hereby shall constitute representations and warranties by [CP & L] hereunder.

According to Hancock, § 11 expressly preserves its right stated in the Terms Sheet and Letter of Agreement not to have the Bonds redeemed for a ten-year period with borrowed funds at an interest rate lower than the 11⅛% rate of the Bonds.

CP & L argues that the Purchase Agreement, Supplement, and Mortgage authorize the special redemption. The Purchase Agreement states that the Bonds shall be subject to redemption (including redemption through operation of a sinking fund) as provided in the Supplement.[2] Section 1(I) of the Supplement contains the provisions for general redemptions including a limitation against using borrowed funds for redemption at general redemption prices.[3] Section 1(II) of the Supplement contains the provisions for special redemptions:

"(II) Bonds of the Twenty-first Series shall also be redeemable in whole at anytime, or in part from time to time, prior to maturity, upon like notice, by the application (either at the option of the Company or pursuant to the requirements of the Mortgage) of cash deposited with the Corporate Trustee pursuant to any of the provisions of Section 38 [Maintenance Fund], Section 39 or Section 64 of the Mortgage or with the Proceeds of Released Property at the special redemption price of the principal amount of the bonds to be redeemed without premium,

---

**2.** Section 1(III) of the Supplement provides for partial, periodic payment of the Bonds through a sinking fund. CP & L agreed to deposit with Irving prior to December 1 of each year from 1976 to 1993 an amount in cash sufficient to redeem at the special redemption price a principal amount of the Bonds equal to 4% of their greatest principal amount outstanding at any time prior to October 1 of that year. The operation of the sinking fund is not in dispute in this litigation.

**3.** Section 1(I) of the Supplement deals with redemption of the Bonds at CP & L's option at the general redemption price. The general redemption price starts at 111.125% of par in 1975 and scales down to par in equal interest amounts over a period of twenty years. CP & L must also pay any accrued interest, and the right to call is subject to the provision that none of the Bonds could be redeemed for ten years with borrowed funds having an effective interest cost to CP & L of less than 11⅛% per annum.

together with accrued interest to the date fixed for redemption; . . ."

CP & L contends that it properly redeemed Bonds under § 1(II) of the Supplement because the redemption was pursuant to § 38 of the Mortgage. Under § 38(II), CP & L agreed to set aside at least fifteen percent of its gross operating revenue in a maintenance and renewal fund ("Maintenance Fund") to maintain, repair, or replace its property serving as the bondholders' security. Section 38(II) requires that CP & L's Treasurer supply a 13-item "Treasurer's Certificate of Maintenance" to Irving by March 31 of each year. The first four clauses mandate that the Treasurer report fifteen percent of CP & L's gross operating revenues in the reporting year or any lesser amount that regulatory authorities allow as a charge against income for maintenance and property requirements. Clauses (5) through (11) provide for the itemization of CP & L's expenditures for maintenance and replacement and other permitted credits against the amount stated in clause (4) [4]. Clause (12) adds up clauses (5) through (11), and if the total equals or exceeds the total in clause (4), CP & L has made sufficient expenditures for repairs and new facilities to preserve the bondholder's security. If the total falls short of the amount required in clause (4), the deficit is stated in clause (13), and CP & L must make a cash deposit with Irving in an amount equal to the deficit to serve as a reserve to protect the bondholders. Under § 38(II), CP & L can, and in this case did, utilize the cash placed with Irving in the Maintenance Fund to redeem bonds at the special redemption price.

### C. The Redemption.

When CP & L filed the March 31, 1977 Certificate, it deposited $38,000,000 into the Maintenance Fund. At that time, CP & L had sufficient property additions available for credits under clause (7) to meet its maintenance obligation, but decided not to use them.[5] CP & L contends that clause (7), which requires the treasurer to state "the Cost [or] Fair Value to the Company, whichever is less, . . . of any Property Additions which are not then Funded Property . . . and which the Company *elects* to make the basis of a credit under this subsection (II)" (emphasis added), does not mandate that CP & L take this credit but allows them to "elect" to use the credit if it wishes to do so. Hancock protested to CP & L when it learned that CP & L had deposited cash in the Maintenance Fund when credits were available to meet the maintenance obligation, and Hancock informed CP & L that it could not use that cash to avoid the call-protection provision of § 1(I) of the Supplement.

CP & L ignored Hancock's protest and deposited $42.1 million in cash in the Maintenance Fund in 1978 despite having ample available property under clause (7) to serve as a credit against its maintenance obligation. On June 2, 1978, CP & L, over the protest of Hancock, redeemed the then outstanding $46,000,000 of the Bonds with the cash that it had deposited in the Maintenance Fund in 1977 and 1978. The purchase was at par without premium.

**4.** Two of these clauses are crucial in resolving this lawsuit. Clause 5 requires the Treasurer to state "expenditures . . . for repairs and maintenance of the Mortgage and Pledged Property" as a credit against the obligation stated in clause (4). Clause 7 requires the Treasurer to state "the Cost of [sic] Fair Value to the Company, whichever is less, as shall be shown by an Engineer's Certificate and/or Independent Engineer's Certificate delivered to the Corporate Trustee, of any Property Additions which are not then Funded Property . . . and which the Company elects to make the basis of a credit under this subsection II." Under clause (7), CP & L may designate new additions to its plant and equipment to serve as a credit against its obligation in clause (4) as long as that property is not already mortgaged under a bond issue.

**5.** According to Hancock, CP & L had $858,166,-054.62 of property that was available for credit under § 38(II)(7) in February 1977 and $956,-364,618.43 of this property in February 1978. CP & L, rather than using the property as a credit, entered a "0" in clause (7) of the Certificate in March of 1977 and 1978 and triggered a shortfall in its maintenance obligation which required it to deposit the $46,000,000 in cash ultimately used to redeem the Bonds.

D. The District Court Proceedings.

Hancock filed suit against CP & L on December 9, 1980, and alleged that CP & L breached its promises that it would not redeem the bonds without paying a premium and that, for 10 years, it would not at its option redeem the bonds out of cheaper borrowings. The thrust of Hancock's argument is that clause (7) of § 38(II) required CP & L to state available property additions as credits and that CP & L's entitlement to "elect" means only that if less than all of the available properties are required to meet the Maintenance Fund obligation, then CP & L may elect from its properties which ones it wishes to use. According to Hancock, the Maintenance Fund could not be used to circumvent CP & L's promise not to redeem the Bonds with cheaper borrowings.

After cross motions for summary judgment, the parties stipulated to a written trial record on the issue of liability. The district court found that § 38(II)(7) unambiguously states that the taking of credits for property additions is at CP & L's election and that Hancock's interpretation of clause (7) lacked support from any source. The district court found that § 1(II) of the Supplement confers the right to use cash deposits to make special redemptions and that the prohibition on redemptions using cheaper borrowed money in § 1(I) of the Supplement applies only to general redemptions and not to special redemptions under § 1(II). The district court also concluded that no grounds existed for reformation of the contract.

On appeal, Hancock contends that the district court misinterpreted the contract. Hancock argues that § 38(II)(7) requires that CP & L credit available property additions and that this requirement is reinforced when § 38(II) is read in conjunction with the other documents concerning the purchase of the Bonds. Hancock also argues that the general understanding in the industry is that the redemption undertaken by CP & L is improper and maintains that

the redemption was contrary to the purpose of the Maintenance Fund to protect bondholders. If the contract does allow the special redemption, Hancock argues that it should be reformed to reflect the true intent of the parties not to allow the special redemption. CP & L argues in response that the district court properly interpreted the contract language and correctly concluded that the special redemption was not a breach of the contract.

## II. Discussion

### A. Breach of Contract.

■ Hancock's first contention is that § 38 of the Mortgage does not authorize CP & L at its option to deposit cash with Irving instead of meeting the 15% requirement by using property additions available for this purpose. Hancock argues that the use of "elects" in clause (7) connotes a requirement to designate rather than a leave to abstain. According to Hancock, this meaning is confirmed by clauses (12) and (13), which refer to the amounts "required to be stated" by the previous clauses, including clause (7). Hancock also argues that § 38 was designed to protect bondholders and should not be used to permit CP & L to deprive bondholders of their bargain. Hancock concludes that clause (7) allows CP & L only to elect which property to use a credit from its available property and does not allow it to elect to take no credit at all.

Hancock's contention falls in the light of the plain language used in clause (7). CP & L is required in clause (7) to state only the amount of property additions that it "elects" to use as a credit. Read in context, the term "elects" connotes that CP & L has the right to choose or not to choose property to serve as a credit under clause (7). This interpretation is supported by the lack of a requirement in any of the contract documents that CP & L use property additions, when available, to meet the requirements of the Maintenance Fund.[6] Han-

---

**6.** We note that the Mortgage is very detailed and that it would have been a simple matter to

insert a requirement that CP & L must use available property additions as a credit. For

cock's reliance on clauses (12) and (13) is misplaced. These clauses only "require" CP & L to state some amount, but they do not indicate that the stated amount cannot be zero. We conclude that the district court properly rejected Hancock's contention that § 38 on its face precluded the special redemption.

■ Hancock's second contention is that § 38 must be interpreted to preclude the special redemption when it is read with all the relevant contract language. Hancock argues that § 11 of the Purchase Agreement expressly provided for the survival of prior "agreements, representations, and warranties." According to Hancock, the survival clause can refer only to the Terms Sheet and Letter of Agreement, which provided that CP & L would not redeem the Bonds with borrowings having a lower effective interest cost than the Bonds. Hancock also notes that § 11 was expressly excepted from § 14 of the Purchase Agreement, which states that the Purchase Agreement embodies the parties' entire understanding. Hancock contends that these provisions were clearly intended to ensure that CP & L's promise not to redeem did not disappear under boilerplate in later documents, and it concludes that § 38 must be interpreted to preclude the redemption if

the parties' intent as expressed in the entire contract is to be preserved.[7]

We reject Hancock's argument that § 38 should not be given its plain meaning because of language in the Terms Sheet and Letter of Agreement. The Terms Sheet is only a summary and proposal. It contemplated future formal legal instruments, containing the parties' assent to specific terms, and further negotiations to work out these details. The Letter of Agreement by its own terms is not a definitive contract of purchase or an attempt to define all the substantive terms. Moreover, the Letter of Agreement specifies that the purchase "is subject to the execution of a Purchase Contract, a Supplemental Indenture and other legal instruments containing representations, warranties, conditions, and covenants satisfactory in form and substance." In these documents, therefore, the parties explicitly contemplated that the bulk of the terms and conditions of the final purchase were yet to be worked out. *See Brause v. Goldman,* 10 App.Div.2d 328, 199 N.Y.S.2d 606 (1st Dept.), *aff'd,* 9 N.Y.2d 620, 172 N.E.2d 78, 210 N.Y.S.2d 225 (1961).

■ The definitive documents in this transaction were the Purchase Agreement, Supplement, and Mortgage.[8] The Purchase

---

example, the use of actual maintenance expenses as a credit is not elective under clause (5).

7. Hancock argues that it is an axiomatic principle of contract construction that the "contract must be interpreted as a whole," *Hutchins v. Bethel Methodist Home,* 370 F.Supp. 954, 962 (S.D.N.Y.1974), and that a contract should be read to give force and effect to all of its provisions. *See Corhill Corp. v. S.D. Plant, Inc.,* 9 N.Y.2d 595, 599, 217 N.Y.S.2d 1, 3, 176 N.E.2d 37, 38 (1961); *Muzak Corp. v. Hotel Taft Corp.* 1 N.Y.2d 42, 46, 150 N.Y.S.2d 171, 174, 133 N.E.2d 688, 690 (1956). Hancock maintains that a reading of § 38 that permits CP & L to redeem the Bonds at the special redemption price from cheaper followings when called and non-refundable protection was expressed in the Terms Sheet and Letter Agreement does violence of these rules of interpretation.

8. New York law recognizes that definitive, particularized contract language takes precedence over expressions of intent that are general, summary, or preliminary. As one New York

Court has explained, "Thus, where the parties have particularized the terms of a contract an apparently inconsistent general statement to a different effect must yield." *Preminger v. Columbia Pictures Corp.,* 49 Misc.2d 363, 267 N.Y. S.2d 594, 599 (Sup.Ct.N.Y.Co.), *aff'd,* 25 App. Div.2d 830, 269 N.Y.S.2d 913 (1st Dept.1966), quoting *Petty v. Fidelity Union Trust Co.,* 238 App.Div. 96, 99–100, 263 N.Y.S. 1, 4–5 (2d Dept.1933), *aff'd,* 262 N.Y. 690, 188 N.E. 123 (1933). In *Brause v. Goldman,* 10 A.D.2d 328, 199 N.Y.S.2d 606 (1st Dept.1960), *aff'd,* 9 N.Y.2d 620, 172 N.E.2d 78, 210 N.Y.S.2d 225 (1961), the court rejected the contention that a letter of agreement purported to be merely a preliminary memorandum constituted a binding agreement when it clearly contemplated further negotiations and formalizations of assent on the terms and additions. *See Chemical Bank v. State of New York,* 64 App.Div.2d 755, 406 N.Y.2d 633 (3d Dept.1978), in which the Court denied a breach of contract claim because a "thorough reading" of the contract would have alerted the plaintiff that his understanding of the agreement based on summary

Agreement states that the Bonds, "shall be subject to redemption" as provided in the Supplement and also provides that the bonds are "to be issued under and secured as provided in" the Mortgage and Supplement. Section 1(II) of the Supplement provides that the Bonds "shall also be redeemable in whole at any time" at the special redemption price with cash deposited with Irving pursuant to § 38 of the Mortgage. The Purchase Agreement and Supplement clearly provide for the cash deposit and special redemption that took place, and the limitation on redemptions using borrowed funds found in § 1(I) of the Supplement applies only to general redemptions and not to the special redemption in this case. We hold that the district court properly interpreted the contract in concluding that CP & L did not breach any of its provisions.

Several other factors support our holding. CP & L introduced information from industry seminars and publications showing that special redemptions from maintenance funds have long been recognized as a possible course for bond issuers to take and are not contrary to industry understanding, as Hancock contends. We also note that the two other courts which have considered the issue presented in this case have reached the same conclusion as this Court. In *Lucas v. Florida Power & Light Co.*, No. 79–4009, (S.D.Fla., April 13, 1981), the district court rejected a claim that a mortgage provision required Florida Power and Light to utilize available credits from property additions to satisfy its annual maintenance and replacement fund requirements. The court found that Florida Power and Light had the right to elect to deposit cash regardless of the availability of credits for property additions. Similarly, in *Harris v. Union Electrical Co.*, 622 S.W.2d 239, 243 (Mo.Ct.App. 1981), the court found that a provision in the supplemental indenture which prohibited redemption for ten years with funds borrowed at a lower cost did not prevent special redemptions from the improvement or maintenance funds.

A final point supporting our conclusion is that the special redemption in this case is not inconsistent with the purpose of the Maintenance Fund to protect the rights of bondholders. Hancock argues that CP & L's redemption is contrary to the express purpose of § 38 to protect the bondholders' collateral. Special redemptions under CP & L's mortgage have the effect of leaving more property behind each bond while reducing the total amount of bonds that the company can issue.[9] The effect may leave the individual bondholders whose bonds were called feeling aggrieved, but the net result is that the remaining bondholders as a group are better protected than they were before the special redemption.

Based on our review of the documents forming the purchase agreement and our understanding of the purpose behind maintenance funds, we conclude that the district

---

sheets was in error, and *William Higgins & Sons, Inc. v. State of New York*, 20 N.Y.2d 425, 231 N.E.2d 285, 284 N.Y.S.2d 697 (1967), in which the court held that a specific provision will not be set aside in favor of a catchall clause.

In a case involving the conversion rights of holders of a convertible debenture, the Fifth Circuit, applying New York law, recognized that courts must look to the details of the indenture to determine issues such as redemption and convertibility rather than to less detailed expressions of the agreement, such as the terms on the face of the debenture. *Broad v. Rockwell International Corp.*, 642 F.2d 929 (5th Cir.), *cert. denied*, 454 U.S. 965, 102 S.Ct. 506, 70 L.Ed.2d 380 (1981).

**9.** Under § 25 of the Mortgage, bonds are authenticated for issue in an amount equal to 70% of property additions. Accordingly, bonds are issued based upon approximately 142% of their value in funded property. When bonds are redeemed to meet maintenance fund requirements, the funded property that was used to issue those bonds cannot be used again to issue bonds. Thus, the use of cash and bond redemption to meet maintenance fund requirements has the effect of indirectly meeting these requirements with 142% of property additions instead of directly meeting them by electing 100% of property additions. The result is that the ratio of bonds to property changes, the property left behind each bond increases, and the total amount of bonds that CP & L can issue decreases. The resulting ratio of property to bonds is more favorable for the remaining bondholders.

court correctly determined the breach of contract issue. We affirm the district court's dismissal of the breach of contract action.

### B. Reformation.

Hancock asks this Court to reform § 38 if we decide to affirm the district court's disposition of the breach of contract claim. Hancock argues that the plain intent of the parties in 1974 was that CP & L could not redeem the Bonds in the manner it did in 1978. Hancock relies on the expression of intent found in the Terms Sheet and Letter of Agreement to argue that CP & L agreed not to redeem the Bonds as it did. Hancock contends that CP & L deceived the bond purchasers by not disclosing its interpretation of § 38 in 1974 or defrauded them by changing its interpretation later to its advantage.

Under New York law, a contract may be reformed if there is mutual mistake or a mistake by one party coupled with fraud or inequitable conduct of the other party. *See Brandwein v. Provident Mutual Life Insurance Co.,* 3 N.Y.2d 491, 496, 146 N.E.2d 693, 695, 168 N.Y.S. 964, 967 (1957).[10] Hancock has not shown a mutual mistake because there has been no showing that CP & L did not intend exactly what is written in the Mortgage and Supplement. We also conclude that Hancock did not show a unilateral mistake coupled with fraud or inequitable conduct. Prior to purchase, Hancock received the Mortgage and Indenture and should have been aware of the provisions for special redemptions after a thorough reading of the contract. CP & L also showed that these provisions were common and that their possible effects were known in the industry. There is simply no evidence of deception, fraud, or inequitable conduct on the part of CP & L. We hold that reformation is not available on these facts.

### III. Conclusion

Hancock has failed to show that CP & L breached the contract for the sale of the Bonds or acted in a manner calling for reformation of the agreement. The district court properly interpreted the contract based on the plain meaning and evident intent of its provisions. CP & L had every right to redeem the Bonds in the manner that it did. We affirm the district court's judgment dismissing the complaint.

---

**10.** In addition, New York courts have required that "to overcome the heavy presumption that a deliberately prepared and executed written instrument manifested the true intention of the parties, evidence of a very high order is required." *George Backer Management Corp. v. Acme Quilting Co.,* 46 N.Y.2d 211, 219, 413 N.Y.S.2d 135, 385 N.E.2d 1062 (1978).