OPINION OF THE COURT
Helen E. Freedman, J.
This case addresses the issue of the rights of an author and a publisher where the author has granted full property rights *922 in a work to the publisher, but where the manuscript remains unpublished as a result of a disagreement between the parties. The issue arises in the context of a dispute over publication of a historical work produced to memorialize the experiences of those holocaust victims who suffered the horrors of the Riga Ghetto and the surrounding Nazi concentration camps in Latvia.
Plaintiff (Society) is a society composed of the survivors of a ghetto set up by the Nazis in the City of Riga, Latvia, during the period 1941-1943. Defendant Henry R. Huttenbach (Professor Huttenbach) is a history professor at City College of the City University in New York and a recognized specialist in holocaust studies. Plaintiff hired defendant to write a book relating the experiences of survivors of the ghetto as a memorial to those who had died. The decision to hire defendant came after extensive discussions and a written proposal by Professor Huttenbach concerning the proposed methodology of obtaining oral history and recollection and after another author, also a professor at City College, was considered and rejected.
Professor Huttenbach commenced the project by interviewing well over 100 persons, many of whom were members or referred by members of the Society and some of whom he located on his own. He received $25 per interview regardless of the amount of time it took and reimbursement for many of his interview-related expenses. These included taxi fares but not transportation to other cities or countries where some of the interviews were conducted.
On June 14, 1982 the parties entered into their first agreement for a book. It was to be entitled "The Holocaust in Riga: A History of the Riga Ghetto.” This first contract specifically provided that a first draft would be prepared by June 30, 1984 and no later than September 1, 1984. Professor Huttenbach would be paid $9,000 to cover expenses and costs of research and writing including interviews and the Society would assume "full ownership and all copyrights of the * * * manuscript.” Other expenses including interviews, typing and "Xeroxing” would be assumed by the Society. Huttenbach would have exclusive access as researcher to all materials in the Riga Ghetto Archive until completion of the manuscript, and thereafter the materials would be subject to limitations contained in an agreement between the Society and Yad Vashem (the Holocaust Museum in Jerusalem). Finally, the manuscript would be published under the authorship of Henry R. *923 Huttenbach, with the Society mentioned as sponsor or publisher. Herman Ziering, vice-president, together with Lore Oppenheimer, president, handled the negotiations on behalf of the Society and signed the agreement, which had been drafted by Huttenbach.
Huttenbach assembled the various material he compiled and the tapes made into an Archive. He prepared a catalogue of the Archive which was published by the Society but for which he received no separate compensation. According to his testimony, a full set of tapes is in the possession of the Society. Other materials constituting the "Riga Ghetto Archive” include copies or reproductions of materials given to Professor Huttenbach and returned to the individuals who submitted them or copies of library research material.
A first draft of the manuscript, a portion of it handwritten, was submitted to the Society in September 1984. Shortly thereafter a typist was hired, and the typed version was submitted to a Mr. Sheinbaum of Shengold Publishers, the publisher selected by the Society, in December of 1984. The first galley was provided both to Professor Huttenbach and to the Society in January of 1985. Mrs. Goldie Waxman was selected by the publisher to work with Professor Huttenbach as his editor. Professor Huttenbach met with a committee of 4 to 6 members of the Society on a number of occasions during February and March of 1985, making those corrections and revisions which he deemed legitimate. When the recollections of various survivors differed he attempted to reconcile versions wherever possible. Where there were outright conflicts, he exercised judgment in determining which views should be presented.
Although the Society indicated to Huttenbach in 1984 that it had a target date of May 1985 for publication, no agreement to finish the work by that date was ever concluded. In March of 1985, the parties entered into another agreement at the instigation of the Society. That agreement, dated March 7, 1985, reiterated the fact that all materials and tapes in the Riga Ghetto Archive belonged to the Society and that any future publication based on the Archive material belonged to the Society. The agreement also stated that "The Society will grant Prof. Huttenbach exclusive use of the Archives for research purposes for a period of 5 years until January 1, 1991.” Revision of the galley was again halted because of a review written by Professor Huttenbach in The Voice of Auschwitz which the Society claimed as an unauthorized *924 publication of its work, but which Professor Huttenbach asserted was merely an advance notice relating to the forthcoming book. In fact, it was a summary of a chapter and was so identified. The review described the systematic mass extermination of Jews in Salaspils, one of the concentration camps surrounding Riga to which ghetto inhabitants were sent. The Society wrote Professor Huttenbach threatening to take his work away and find another author to finish it unless he entered into a third agreement.
Just prior to the signing of the third agreement in May 1985, a fortieth anniversary dinner was held by the Society and a mock-up of the cover of the book was displayed which did not properly credit Professor Huttenbach as the sole author.
That third agreement, signed on June 21, 1985, restated some of the existing arrangements including the compensation plan and the copyright understanding. It added that the finished product would be a "work for hire” but that the professor was an independent writer. It also stated that Professor Huttenbach would not prepare or participate in the preparation of any book or article dealing with the Riga Ghetto and the surrounding camps, including Salaspils, Kaiserwald and Jungfernhof, until January 1, 1991. A handwritten addendum states that failure to deliver the first galley by November 30, 1985 would subject Professor Huttenbach to a fine of $100 per week.
Professor Huttenbach completed his revisions of the first galley in the beginning of November and delivered a copy to Herman Ziering in late November. He then met with Ziering and Lore Oppenheimer in December 1985 and agreed to make six additional copies of the revised galley. These were left with the publisher with a note to forward them to the Society, but Ziering was not notified that they were there until January 1986. The six copies were distributed to board members but not read by Ziering himself.
At about that time or shortly thereafter communications between the parties broke down. Mr. Ziering testified that all of the members of the Society were discouraged by what they perceived to be substantial inaccuracies. He discussed a few of these flaws, relying primarily upon what he had been told by others. Professor Huttenbach expressed total willingness to correct any mistakes as long as he agreed that they were in fact errors.
*925 In 1986 plaintiff brought an action claiming breach of contract and seeking to compel defendant to return all manuscripts, tapes and memorabilia in his possession as well as $100,000 in damages and costs. Although not explicitly stated in the complaint, plaintiff seeks to terminate the arrangement on the ground that defendant has breached its contract and as owner of the copyright seeks to publish the work on its own. Defendant denied allegations that he had breached the contracts and claimed that all of the tapes, memorabilia, and manuscripts were either duplicated and in the hands of plaintiff or belonged to defendant or were on loan from a museum. Defendant further claimed that plaintiff had breached the contract and sought to compel plaintiff to proceed with the editing of the manuscript in preparation for publication. Defendant also counterclaimed for monetary damages including an unpaid sum of $1,600 due under the contract as well as punitive and compensatory damages. Defendant also asserted that he entered into all of the subsequent agreements under duress and sought reformation or rescission to the extent that he be declared sole owner of the property rights in the manuscript. Plaintiff in turn denied the allegations contained in defendant’s counterclaim.
The first issue that will be addressed is the validity of the copyright assignment. The initial contract clearly states that "The Society assumes full ownership and all copyrights of the above mentioned manuscript.” Such a written agreement constitutes a transfer of copyright ownership pursuant to 17 USC § 204 (a) of the Copyright Act of 1976. The ownership of the publisher may also be supported under the "work made for hire” doctrine of 17 USC § 101. If the author prepared the work under the supervision and direction of the publisher, as here, it has been held that the product is a work made for hire even where the author is an independent contractor. (Aldon Accessories v Spiegel, Inc., 738 F2d 548 [2d Cir 1984], cert denied 469 US 982 [1984]; Nadel & Sons Toy Corp. v Shaland Corp., 657 F Supp 133 [SD NY 1987, Kram, J.].) Whether defendant prepared this work as an independent contractor or as a work for hire or a combination of the two, the copyright assignment is clearly valid.
The next issue is whether the publisher as owner of the copyright has the right to drastically change or revise the author’s manuscript and then publish it either under another authorship or combined authorship. Ordinarily, the rights of the parties are determined primarily by the provisions of their *926 contract. In this case, the specific contract provision states "The manuscript agreed upon will be published under the authorship of professor Henry R. Huttenbach, with the Society mentioned as sponsor and/or publisher.”
There are other principles which have emerged in both the field of copyright law and the law of unfair competition, which are relevant to the issues presented here. The copyright law of most countries of the world recognizes a so-called "moral right” (droit moral) that protects authors from modification of their works in such a manner as to affect the artistic impression of the work. While the moral right doctrine as such has never been a part of United States copyright law, the case Edison v Viva Intl. (70 AD2d 379 [1st Dept 1979]) implies that under certain circumstances an author’s work may be entitled to protection. In Edison (supra, at 384), the court in an opinion written by Hon. Francis T. Murphy stated that while there is no moral right doctrine expressly recognized in either United States law or in the Universal Copyright Convention, "a right analogous to 'moral right’ * * * has been recognized in this country and in the common-law countries of the British Commonwealth so that in at least a number of situations the integrity and reputation of an artistic creator have been protected by judicial pronouncements”. The decision went on to say that the rights of the author are controlled by the terms of the contract and where the contract is silent, custom and usage will be examined to determine what rights the artist has under the contract. The contract there provided that the publisher reserved the right to edit "or otherwise change the work” as the publisher found reasonably necessary. The court held that if custom and usage limits the expression "edit and change” to "reasonable modification * * * but does not allow a substantial departure therefrom” then plaintiff would prevail in his claim of breach of contract based on substantial changes made in a text. (Supra, at 383.)
To some extent the decision in Edison (supra) relied upon the holding of Preminger v Columbia Pictures Corp. (49 Misc 2d 363 [Sup Ct, NY County 1966, Klein, J.], affd 25 AD2d 830 [1st Dept 1966], affd 18 NY2d 659 [1966]), which established the right of an owner to cut and edit so long as custom and usage so provided and as long as the artistic merit of the work, in that case the film "Anatomy of a Murder”, was not impaired.
Case law interpreting section 43 of the Lanham Act (15 USC § 1125 [false designations of origin]) also protects an artist’s or *927 author’s rights. In Gram v Harris (198 F2d 585 [2d Cir 1952]) the Second Circuit held that publication of a truncated version of a jazz concert with the legend "Presented by Norman Granz” constituted a false attribution of authorship and hence unfair competition. The contract of sale or reproduction rights to discs had required that the legend be carried whenever the product was sold by the defendant. Similarly in Gilliam v American Broadcasting Cos. (538 F2d 14, 25 [2d Cir 1976]) the court held that the offering by ABC of a mutilated version of a work (the Monty Python series) constituted a false designation of origin which "impaired the integrity of appellants’ work and represented to the public as the product of the appellants what was actually a mere caricature of their talents.”
In addition, there are cases from other jurisdictions which have held that an author who sells his work still has a right to have his name on it unless the contract of sale specifically gives the publisher unrestricted rights to change the name. (See, Smith v Montoro, 648 F2d 602 [9th Cir 1981]; John Wright, Inc. v Casper Corp., 419 F Supp 292 [ED Pa 1976], affd in part sub nom. Donsco, Inc. v Casper Corp., 419 F2d 602 [3d Cir 1978].) In the case at bar, the contract requires that defendant’s name as the sole author of the work be used in connection with any publication of the work.
Plaintiff argues that defendant should not be able to invoke any contractual or common-law rights inasmuch as he breached the contracts. Clearly a substantial breach would render the contractual provisions null and void. However, while there may have been certain misunderstandings concerning the timetable for publication, plaintiffs have failed to establish that defendant has breached the contract in any substantial manner or indeed that the parties acted in a manner consistent with a breach of contract.
Original copies were submitted and reviewed. Extensive revisions occurred. Disputes were resolved by negotiating subsequent agreements. The work while still in need of substantial editing, appears to be scholarly, thoughtful and comprehensive. Each party put time and effort into complying with the terms of the agreement, but in the end it was the attitude and personal sensitivities of the members of the Society and not the actions of Professor Huttenbach that made continued performance of the contract impossible. A party who actively interferes with the performance of a contract may not then recover damages or benefit by its own *928 actions. (See, Honeywell, Inc. v City of New York, 67 NY2d 297 [1986]; Young v Whitney, 111 AD2d 1013 [3d Dept 1985].)
Professor Huttenbach’s counterclaim seeks to compel the Society to work with him and to finish the book and cites Dell Publ. Co. v Whedon (577 F Supp 1459 [SD NY 1984, Lumbard, J.]) as authority. That case held that a publisher who had solicited a manuscript from an author and approved an outline and a portion of the manuscript could not demand repayment of a cash advance based on disapproval of the final product. The court in Dell Publ. found that the publisher had an implied good-faith obligation to offer the author a proper opportunity to revise the manuscript with editorial assistance and that based on its failure to do so, the author was discharged from all of her obligations under the contract including the grant to the publisher of exclusive rights in the manuscript.
This court would like to order both parties here to work together and revise the manuscript with the assistance of a mutually agreed-upon editor inasmuch as the effort expended has been enormous and the research performed is extremely valuable and to a large extent not capable of being duplicated. However, even in Dell Publ. (supra) the court merely said the author should have been allowed to complete the work — not that the parties must work together. It was obvious from the testimony, as well as the demeanor of those on the witness stand and present in court, that there has been a total breakdown in the relationship of the parties, partly as a result of poor communication and partly as a result of personality conflict. The court cannot mandate cooperation between reluctant parties.
However, based on the foregoing analysis, it is clear that neither party may publish nor use the work without the full consent of the other. Use of either the manuscript prepared by Professor Huttenbach or any of his work product, like his tapes, would violate the provisions of the contract and would constitute passing off in violation of the author’s moral rights. The first contract specifically states that Professor Huttenbach’s name would appear as sole author, and the second grants exclusive use of any material to Professor Huttenbach until at least 1991. Therefore, this court is not in a position to require return of any items prior to that time, unless they were specifically given by members of the Society. Similarly, publication of the work by Professor Huttenbach without the *929 consent of the Society would also violate the terms of the original contract and the subsequent modifications. The work was paid for by the Society in return for assignment of copyright and for that reason the right to keep Professor Huttenbach from publishing it separately is enforceable.
Accordingly, both parties are permanently enjoined from using and publishing any of the work or work product of Professor Huttenbach without the express consent of both. In view of the current impasse, each party shall retain the materials in his or its possession. The Society is ordered to pay the remaining $1,600 due on the contract to Professor Huttenbach. Further relief is denied.