06-5316-cv
Topps Co. v. Cadbury Stani S.A.I.C.

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

_____

August Term, 2007

(Argued: December 12, 2007                    Decided: May 15, 2008)

Docket No. 06-5316-cv

_____

The Topps Company, Inc.,

Plaintiff-Appellant,

v.

Cadbury Stani S.A.I.C., f/k/a Productos Stani
Sociedad Anonima Industrial y Comercial,

Defendant-Appellee.

_____

Before:
        CARDAMONE, and POOLER, Circuit Judges,
            and KEENAN,* District Judge.

_____

     Plaintiff appeals from the judgment of the United States District Court for the Southern District of New York (Haight, J.), entered November 8, 2006, dismissing claims for breach of contract and misappropriation of trade secrets.

     Reversed and remanded.

_____

_____

*     Honorable John F. Keenan, United States District Judge for the Southern District of New York, sitting by designation.



DAVID G. EBERT, New York, New York (Patricia Hewitt, Mioko Tajika, Caitlin L. Bronner, Ingram Yuzek Gainen Carroll & Bertolotti, LLP, New York, New York, of counsel), <u>for Plaintiff-Appellant</u>.

DENNIS P. ORR, New York, New York (Stefan W. Engelhardt, John W.R. Murray, Morrison & Foerster LLP, New York, New York, of counsel), <u>for Defendant-Appellee</u>.

CARDAMONE, Circuit Judge:

Plaintiff appeals from a grant of summary judgment in favor of defendant in litigation between two multinational corporations. This litigation concerns chewing gum, principally "Bazooka" bubble gum, known in this country by its small -- less than an inch -- paper-wrapped package and accompanying comic strip. Chewing gum is a pastime engaged in since ancient times when the substance chewed was a resin taken directly from certain trees. Nowadays people generally chew the industrially-produced version. They do so for a variety of reasons, including: to cleanse teeth and freshen breath; to focus the mind during athletic competitions; to calm the stomach; and to take the place of smoking. One's inability to chew gum while simultaneously carrying out other routine activities, such as walking, is sometimes used as an epithet. And, of course, because gum is today a sugary confection it is sweet and chewing gum is enjoyable and fun.

Such a widely enjoyed product is a big seller in the marketplace and a dispute over the manufacture and distribution of "Bazooka" bubble gum and another brand in parts of South America is what precipitated the instant litigation. On this appeal we review a grant of summary judgment to defendant, which had been licensed for many years by plaintiff to make and sell these products. In reaching its decision the United States District Court for the Southern District of New York (Haight, J.) relied heavily on an analysis of trademark rights and the sale of

2

goodwill that led it into a complex and evolving area of the law. We believe it erred here as well as in other aspects of its reasoning. Yet, it is not our purpose in this opinion to plant new guideposts into the trademark terrain. We write, rather, simply to explain why this case was not ripe for summary judgment.

## BACKGROUND

The Topps Company, Inc. (Topps or plaintiff) is a New York corporation that makes and sells chewing gum under a number of brand names, including the "Bazooka" brand. Cadbury Stani S.A.I.C., f/k/a Productos Stani Sociedad Anonima Industrial y Comercial (Stani or defendant) is an Argentinian corporation to which, beginning in 1957, Topps granted, through a series of licensing agreements, the exclusive right to manufacture, sell and distribute "Bazooka" and other Topps chewing gum brands in five South American countries: Argentina, Bolivia, Chile, Paraguay and Uruguay. See Topps Co. v. Cadbury Stani S.A.I.C., 454 F. Supp. 2d 89, 91 (S.D.N.Y. 2006).

### A. The Licensing Agreements

The original 1957 licensing agreement provided for Topps to share with Stani "the know-how, formulae, processes and techniques used by Topps" in return for royalties on Stani's sales. The 1957 agreement was set to expire after 20 years. But in 1976, one year short of the contract's termination, the parties executed a new agreement, providing for the continued sharing of "manufacturing technology, marketing concepts and

3

techniques, administrative and consultive assistance and trademark use" in return for Stani paying a yearly license fee. The 1976 agreement had a term of ten years, with an option for Stani to extend it for another ten years.

Four years later, in 1980, the parties simultaneously executed two additional agreements that are the subject of the present dispute. One was an Amended and Restated License Agreement. It contained terms similar to those set out in the 1976 license agreement, but extended the license until April 30, 1996. Paragraph 2 of the 1980 license agreement stated that Topps granted to Stani

> the exclusive non-assignable right and license to manufacture in Argentina, Bolivia, Chile, Paraguay and Uruguay and sell within the Territory, during the continuance of this Agreement, Licensed Products employed by TOPPS in [enumerated locations] and in any subsequent established affiliated plants of TOPPS.

This language was nearly identical to that of paragraph 2 of the 1976 license agreement, except that the 1976 agreement referred to "Licensed Products utilizing TOPPS Technology" (emphasis added) while the 1980 agreement referred simply to "Licenced Products."

Paragraph 3 of the 1980 license agreement stated

> [t]he TOPPS Trademarks and the TOPPS Technology shall at all times remain the exclusive property of TOPPS or its assigns and the rights hereby granted to STANI shall be by way of license or, if required by trademark regulations within the Territory, by way of registered user rights.

4

Again, this language was nearly identical to that used in the 1976 licensing agreement. In addition, both agreements defined Topps Trademarks as "all Chewing Gum and Other Topps Products trademarks, owned, used or originated by TOPPS," and they defined Topps Technology as "the specialized knowledge and experience of TOPPS applicable to the manufacture and/or sale of Licensed Products," including "formulae, recipes, processes, equipment utilization, labour and equipment standards, ingredient specifications, factory management and production planning techniques, factory facility design and layout and quality control procedures, including gum base technology."

The 1980 and 1976 license agreements provided for early termination by either party on certain grounds, and both specified that upon termination Stani, among other things, would have no further right "to use any of the TOPPS Trademarks or the TOPPS Technology except for use in connection with selling and disposing of Licensed Products on hand" under specified conditions.

Further, Paragraph 30 of the 1980 license agreement (like Paragraph 32 of the 1976 agreement) contained the following language

> All the terms of the Agreement between the
> parties are herein set forth and no
> modification, amendment alteration or
> variation of the terms of this Agreement
> shall be valid unless in writing signed by
> TOPPS and STANI. No agreement, letter or
> other communication between the parties shall
> be deemed to be a modification or amendment
> of this Agreement or any terms hereof, unless

5

such agreement, letter or other communication expressly provides that it is intended to be a modification or amendment of this Agreement.

## B.   The Escrow Agreement

On the same day the 1980 license agreement was executed, the parties also signed what they termed an Escrow Agreement. This escrow agreement set out the terms by which the minute book, stock book, and stock certificates of one Verco Holding Corporation would be held in escrow and delivered to Stani's owner on May 31, 1996 unless Stani defaulted under the 1980 license agreement or other enumerated events occurred. The preamble to the escrow agreement stated, "Topps has transferred legal title to the registration in Argentina of the trademarks 'Bazooka', 'Topps' and related trademarks to the Verco Holding Corp., a New York corporation, all of the capital stock of which is issued in the name of [Stani's owner]." In exchange for the transfer, Stani paid Topps $100,000. Topps, 454 F. Supp. 2d at 98.

## C.   The Dispute

The 1980 license agreement expired by its own terms on April 30, 1996, and it appears the escrow agent, as provided in the escrow agreement, transferred the stock and corporate papers to Stani's owner on May 31, 1996. Topps, 454 F. Supp. 2d at 98. Three years later, in 1999, Topps brought the present suit against Stani, contending that Stani continued to use Topps chewing gum formulas (considered Topps Technology under the

6

license agreements) after April 30, 1996, and that it transferred these formulas and other Topps Technology to its parent company, Cadbury, all in breach of the 1980 license agreement. Topps maintained Stani's conduct constituted wrongful misappropriation of trade secrets under New York tort law. Stani responded by (1) denying it continued to use Topps chewing gum formulas, and (2) arguing that even if it had, such conduct was neither a breach of the agreement nor a wrongful misappropriation because the agreement granted it the right to use plaintiff's formulas. Topps, 454 F. Supp. 2d at 99.

On Stani's motion, the district court granted it summary judgment on all but one of Topps' claims. Id. at 108. The court separated these claims from the one remaining claim in order to render a final, appealable judgment. Topps Co. v. Cadbury Stani, S.A.I.C., 2006 WL 3247360, at *4 (S.D.N.Y. 2006). The trial court concluded that the 1980 licensing agreement, read in conjunction with both the contemporaneously signed escrow agreement and the prior (1976) licensing agreement, unambiguously gives Stani the right to continue using Topps chewing gum formulas even after the 1996 expiration date. Topps, 454 F. Supp. 2d at 101-07. Reasoning from this conclusion, it went on to hold there was neither a breach of contract, nor a wrongful misappropriation of trade secrets. Id. at 107-08. From the ensuing dismissal of its claims, Topps now appeals.

7

## DISCUSSION

### I  Standard of Review

We review a grant of summary judgment <u>de novo</u> applying the same tests used by the district court.  <u>See</u>, <u>e.g.</u>, <u>Compagnie Financiere de CIC et de L'Union Europeenne v. Merrill Lynch, Pierce, Fenner & Smith Inc.</u>, 232 F.3d 153, 157 (2d Cir. 2000). Imposing this procedural remedy is appropriate only when there is no genuine issue with regard to any material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  When deciding a summary judgment motion, a court must construe all the evidence in the light most favorable to the nonmoving party, in this case Topps, and draw all inferences and resolve all ambiguities in that party's favor.  <u>LaSalle Bank Nat'l Ass'n v. Nomura Asset Capital Corp.</u>, 424 F.3d 195, 205 (2d Cir. 2005).

This generally means that a motion for summary judgment may be granted in a contract dispute only when the contractual language on which the moving party's case rests is found to be wholly unambiguous and to convey a definite meaning.  <u>See</u> <u>Compagnie Financiere</u>, 232 F.3d at 157-58.  Ambiguity here is defined in terms of whether a reasonably intelligent person viewing the contract objectively could interpret the language in more than one way.  <u>Sayers v. Rochester Tel. Corp. Supplemental Mgmt. Pension Plan</u>, 7 F.3d 1091, 1095 (2d Cir. 1993).  To the extent the moving party's case hinges on ambiguous contract language, summary judgment may be granted only if the ambiguities

may be resolved through extrinsic evidence that is itself capable of only one interpretation, or where there is no extrinsic evidence that would support a resolution of these ambiguities in favor of the nonmoving party's case. See Compagnie Financiere, 232 F.3d at 158. We turn next to resolve those issues.

## II   The 1980 License Agreement

### A.   Its Ambiguity

On its face, the 1980 license agreement contains no terms expressly granting or denying Stani the right to Topps chewing gum formulas after April 1996, and its provisions bearing on the issue point in different directions. On the one hand, the agreement states, "[t]he TOPPS Trademarks and the TOPPS Technology" -- the latter defined to include Topps chewing gum formulas -- "shall at all times remain the exclusive property of TOPPS or its assigns." And further, where Paragraph 2 grants Stani the right to use Topps formulas, it grants this right only "during the continuance" of the agreement. These provisions strongly suggest Stani had no right to continue using Topps formulas after the agreement's April 1996 expiration date. On the other hand, there is no language in the 1980 agreement expressly stating that Stani's right to the formulas would end with the April 1996 expiration date. By way of contrast, this agreement expressly addresses the loss of Stani's right to these formulas in the event of early termination. Hence, the absence of such express language in the agreement with respect to the

9

regular expiration date could be read to mean Stani's rights to the formulas would continue.

As a consequence, the 1980 license agreement is amenable to two different interpretations. Because we believe a reasonably intelligent person viewing this agreement objectively could choose either interpretation, we hold the agreement is ambiguous. See Compagnie Financiere, 232 F.3d at 158; Sayers, 7 F.3d at 1095.

### B. The Role of Extrinsic Evidence

Given our conclusion that the 1980 license agreement is ambiguous, we look next to the record to determine whether any relevant extrinsic evidence is so one-sided in defendant's favor as to allow Stani's interpretation to prevail on summary judgment. As a preliminary matter, we address Topps' contention that the 1980 escrow agreement and 1976 license agreement are inadmissible for this purpose under the parol evidence rule.

It is conceded that New York law governs the interpretation of the 1980 license agreement. New York's parol evidence rule generally bars admission of extrinsic evidence to vary or contradict the terms of a fully integrated writing. See Primex Int'l Corp. v. Wal-Mart Stores, Inc., 89 NY2d 594, 599-600 (N.Y. 1997). Contrary to the district court's analysis, Topps, 454 F. Supp. 2d at 101 n.11, this rule of inadmissibility of extrinsic evidence applies to both oral and written evidence alike. See Primex, 89 NY2d at 599-600; Farm Stores, Inc. v. Sch. Feeding Corp., 79 AD2d 504, 504-05 (1st Dep't 1980), aff'd 53 NY2d 910

10

(N.Y. 1981). Moreover, Article 30 of the 1980 license agreement appears to express the parties' intent to form an integrated agreement. See Primex, 89 NY2d at 596-97, 599-600.

Nonetheless, extrinsic evidence may be used as a guide to Stani's rights after April 1996 because the 1980 license agreement is facially ambiguous as to these rights. "Even though a document may be fully integrated with respect to the ultimate terms of the agreement, the meaning of those terms may remain unclear." U.S. Fire Ins. Co. v. Gen. Reinsurance Corp., 949 F.2d 569, 571 (2d Cir. 1991) (applying New York law). In such cases, it is proper to consider extrinsic evidence in interpreting the ambiguous terms, irrespective of the parol evidence rule. Id.

The extrinsic evidence in this case, however, does not resolve the ambiguities over Stani's rights for purposes of its summary judgment motion. The 1980 escrow agreement and the 1976 license agreement shed little light on the parties' intent with regard to Stani's rights to Topps formulas after April 1996. In fact, the strongest pieces of extrinsic evidence identified by the parties are Stani's own pleadings and the statement of one of its experts that it had no need for these formulas after that date -- and possibly even much earlier. Far from proving Stani's case, these pieces of evidence lend support to Topps' position.

III  District Court's Analysis

The district court viewed the evidence in a different light. It did so in the context of interpreting what it erroneously believed to be unambiguous contract language. Nonetheless, we

11

address its reasoning at this juncture. Were this reasoning sound, it would apply equally to our evaluation of the evidence for purposes of resolving the ambiguities in the 1980 license agreement.

### A. Of Trademark Law

The trial court relied heavily on the 1980 escrow agreement, which it read in the context of what it understood to be applicable principles of trademark law. It reasoned that if Stani had not been given the right to continue using Topps formulas after April 1996, the 1980 escrow agreement would amount to nothing more than a transfer of the Topps trademarks "in gross," and in that way would "violate the laws of trademark." Topps, 454 F. Supp. 2d at 102. The court concluded the parties must not have intended to contract with each other in such a manner. Id.

We think this reasoning flawed in several respects. First, the district court assumed the "laws of trademark" applicable to this transfer prohibited assignments "in gross." In so doing it looked to U.S. trademark law for the principle that a trademark is simply a symbol of goodwill and cannot be sold or assigned apart from the goodwill it symbolizes. Id. at 102 (citing Marshak v. Green, 746 F.2d 927, 929 (2d Cir. 1984) (citing Lanham Act § 10, 15 U.S.C. § 1060)). An assignment "in gross" is a purported transfer of a trademark divorced from its goodwill, and it is generally deemed invalid under U.S. law. See Marshak, 746

12

F.2d at 929. But in the case at hand the 1980 escrow agreement dealt with trademarks in Argentina, not in the United States.

Although the escrow agreement includes a choice-of-law clause pointing to New York law, the question is not whether or how to enforce this agreement, but rather what was the actual effect, in Argentina, of the purported transfer that the agreement memorialized. The principle of territoriality is fundamental to trademark law. A trademark has a separate legal existence under each country's laws, and trademark rights exist in each country solely according to that nation's laws. See, e.g., ITC Ltd. v. Punchgini, Inc., 482 F.3d 135, 155 (2d Cir. 2007); Person's Co. v. Christman, 900 F.2d 1565, 1568-69 (Fed. Cir. 1990). As a consequence, whether or not the transfer memorialized in the escrow agreement ultimately left Stani with the right to trademarks in Argentina depends on Argentinian law.

This is a significant matter in this litigation because there has been no briefing on the relevant Argentinian law, much less any notification, under Federal Rule of Civil Procedure 44.1, that foreign law would be at issue. Although we decline to rule definitively on this issue under these circumstances, we note that Argentinian trademark law (like that of many countries) appears to permit assignments in gross. See 1 Trademarks Throughout the World § 9:21 (5th ed. 2007); Susan Barbieri Montgomery & Richard J. Taylor, Key Issues in Worldwide Trademark Transfers: Law & Practice 1, 5-6 (2005); Ernesto O'Farrell & Iris V. Quadrio, Argentina in id. at AR-1, AR-11; Mark A.

13

Greenfield, <u>Goodwill As a Factor in Trademark Assignments: A Comparative Study</u>, 60 Trademark Rep. 173, 181-81 (1970).

Second, even were the court's ruling correct that the applicable law prohibited assignments in gross, it is not evident the transfer at issue required a concomitant transfer of Topps chewing gum formulas to avoid qualifying as such an assignment. The goodwill requirement in U.S. law does not mean the assignee's products must be identical to those of the assignor. Instead, they need only be "substantially similar" such that "consumers would not be deceived or harmed." <u>Marshak</u>, 746 F.2d at 930. Stani's own pleadings and the statements of one of its experts strongly suggest a substantially similar product could be produced without using the Topps formulas. At the very least, this question of fact could not be resolved in Stani's favor on Stani's motion for summary judgment.

Third, even if applicable law prohibited assignments in gross and even if the transfer here would have qualified as such without a concomitant transfer of Topps formulas, there still is insufficient proof, for summary judgment purposes, that the parties intended to give Stani the right to these formulas. It could well have been that the parties were attempting an assignment in gross despite the law. In fact it appears businesses take this risk frequently. <u>See</u> Irene Calboli, <u>Trademark Assignment "With Goodwill": A Concept Whose Time Has Gone</u>, 57 Fla. L. Rev. 771, 774 (2005); Nathan Isaacs, <u>Traffic in Trade-Symbols</u>, 44 Harv. L. Rev. 1210, 1210-21 (1931). And, to

14

the extent the parties were looking to U.S. law when they negotiated the escrow agreement, they may well have relied on the then-recent trend toward a more flexible definition of the goodwill necessary to avoid the prohibition against assignments in gross. See Calboli, supra, at 791 ("[B]y the beginning of the 1970s, most courts . . . started to declare assignments valid as long as sufficient continuity or substantial similarity, rather than identity, existed between the marked goods."); Stephen L. Carter, The Trouble With Trademark, 99 Yale L.J. 759, 785-87 (1990) (criticizing this trend). As with the other issues involved in the district court's trademark analysis, this question of the parties' intent was a subject not suitably resolved on summary judgment.

## B. Of Contract Law

The district court also relied on principles of contract law in reading the 1980 escrow agreement and the 1976 license agreement in conjunction with the 1980 license agreement. It looked to the 1980 license agreement's broad definition of "Topps Technology" to include not just the chewing gum formulas at issue but also "all other elements of TOPPS' knowledge and experience." Topps, 454 F. Supp. 2d at 104. The court reasoned that for the agreement to be read as prohibiting Stani's continued use of Topps chewing gum formulas, it would also need to be read as prohibiting Stani's use of everything else defined as Topps Technology, since the agreement does not differentiate between these groups. Id.

15

This reading, the court found, would have "put Stani out of business" or at least forced it to "start over entirely in the gum business, with new plants, new methods, new processes, and all the technical components involved in the making of chewing gum." Id. Such an outcome seemed in the trial court's view inconsistent with the existence of the escrow agreement, which suggested the parties' assumption that Stani would continue to manufacture and sell chewing gum using the "'specialized knowledge and experience' it had acquired from Topps over the course of a 39-year relationship." Id.

The district court also focused on the contrast, noted in Part II A. above, between the 1980 license agreement's express language cutting off Stani's right to use Topps Technology in the event of early termination, and the absence of such a cut-off provision in the contract language establishing the April 1996 expiration date. Id. at 105. Further, it looked to (1) the absence of the words "utilizing Topps technology" in paragraph 2 of the 1980 licensing agreement as compared to paragraph 2 of the 1976 licensing agreement, (2) the fact that the 1980 licensing agreement was set to expire on a date certain whereas the 1976 agreement had the option of renewal, and (3) the fact that Stani had limited rights to terminate the 1980 licensing agreement as compared to its rights to terminate the 1976 licensing agreement. Id. at 105-07. The court took all of these things as signs of the parties' intent for Stani to continue using Topps Technology, including chewing gum formulas, after April 1996. Id. at 107.

16

There is no question that with respect to Stani's rights after April 1996 the 1980 license agreement could have been more clearly written. However, the extrinsic evidence in the record does not weigh so overwhelmingly in Stani's favor as to permit resolution of the agreement's ambiguities on a motion for summary judgment. Quite the contrary, as already noted, Stani's own pleadings and the statements of one of its experts strongly undercut the district court's finding that the company could not remain in business without using Topps Technology. While the differences in the language of the 1976 and 1980 license agreements do support Stani's position to some extent, they do not plainly resolve the question for purposes of summary judgment.

## CONCLUSION

For all of these reasons, we must reverse the district court's grant of summary judgment in favor of defendant. We do so with respect to the breach of contract claim (including Topps' claim with regard to the alleged disclosure of Topps Technology to Cadbury, which was not addressed in the district court's opinion), and also with respect to the misappropriation claim, since the judgment we reverse hinged as to both claims on an erroneous interpretation of the 1980 license agreement.

Accordingly, the case is remanded to the district court for further proceedings not inconsistent with this opinion.

17