No. 22-1026
*Martinez v. Agway Energy Services, LLC*

# In the
# United States Court of Appeals
## For the Second Circuit

August Term, 2022

(Argued:  June 8, 2023     Decided:  December 13, 2023)

Docket No. 22-1026

ANTONIO MARTINEZ, IN HIS CAPACITY AS EXECUTOR OF THE ESTATE OF NAOMI
GONZALES,

*Plaintiff-Appellant*,

–v.–

AGWAY ENERGY SERVICES, LLC,

*Defendant-Appellee.*[*]

B e f o r e :

CARNEY, BIANCO,[†] and MENASHI, *Circuit Judges*.

---

[*] The Clerk of Court is directed to amend the case caption to conform to the above.

[†] Judge Rosemary S. Pooler, originally a member of the panel that heard oral argument in this case, passed away on August 10, 2023. Judge Joseph F. Bianco was selected at random to complete the panel. *See* 28 U.S.C. § 46(d); 2d Cir. IOP E(b).

Antonio Martinez, in his capacity as executor of the estate of Naomi Gonzales, appeals from the judgment of the district court (D'Agostino, *J.*), which granted summary judgment to the defendant Agway Energy Services, LLC ("Agway") in this putative class action for breach of contract and for engaging in deceptive business practices in violation of New York General Business Law §§ 349, 349-d. Agway is an energy supply company that markets electricity to residential customers in New York and Pennsylvania. In 2016, Gonzales entered into an electricity supply agreement with Agway, under which she would receive a one-month promotional rate and then be charged a "competitive" variable monthly rate to be set at Agway's "discretion." The agreement listed several factors guiding that discretion, including "market-related factors" and Agway's "costs, expenses and margins." Agway also promised to "automatically" include its EnergyGuard service, which covered up to $2,000 in parts and labor for specified repairs related to the electrical services provided. Gonzales had the right to cancel her agreement at any time without penalty. She maintained the contract for almost two years. Soon after she canceled the agreement, she sued Agway on behalf of a putative class of New York and Pennsylvania customers, alleging that Agway's monthly variable rate was consistently higher than that charged by the incumbent local utility and claiming that Agway breached its agreement by failing to charge "competitive" rates and by charging customers for the cost of EnergyGuard as part of its overall rate. On behalf of the New York customers, she also argued that Agway's conduct violated New York's General Business Laws. Because Gonzales received what was promised under the plain terms of the agreement, we affirm the district court's grant of summary judgment to Agway.

AFFIRMED.

———————

D. GREGORY BLANKINSHIP (Todd S. Garber, Bradley F. Silverman, *on the brief*), Finkelstein, Blankinship, Frei-Pearson & Garber, LLP, White Plains, New York, *for Plaintiff-Appellant*.

JOHN D. COYLE, Coyle Law Group LLP, Morristown, NJ, *for Defendant-Appellee*.

———————

2

CARNEY, *Circuit Judge*:

In February 2016, Naomi Gonzales entered into an electricity supply contract with Defendant-Appellee Agway Energy Services, LLC ("Agway"), an energy supply company incorporated in Delaware and selling electricity to residential and other customers in New York and Pennsylvania. Under its agreement with Gonzales ("the Agreement"), Agway would charge an introductory rate of $0.044 per kilowatt hour ("kWh") for one month, and, if she chose to continue receiving its services thereafter, it would then charge her a "competitive monthly variable price," which would be "determined at Agway's discretion." App'x at 766–67. Agway's materials represented that, along with electricity services, it would "automatically" include its EnergyGuard program, which it described as providing services for "protection in the event of a breakdown of [the customer's] residential central air conditioning unit or a problem with the electrical wiring in [the customer's] home*." Id.* at 766–69. The Agreement was explicit that purchasing electricity from Agway would not guarantee future savings, and that the customer was free to cancel the Agreement at any time without paying a termination fee.

After maintaining the Agreement for almost two years, Gonzales exercised her termination rights toward the end of 2017 and returned to her local default utility, Central Hudson, as her source of electricity. During the period of its Agreement with Gonzales, Agway charged a variable rate that was between 1 and 6 cents per kWh higher than Central Hudson's regulated rate.

In December 2017, Gonzales sued Agway in federal district court, alleging that Agway's variable rate was "unconscionably high" compared to the rates charged by Central Hudson during the term of the Agreement. She brought claims for breach of contract, breach of the implied covenant of good faith and fair dealing, and unjust enrichment, all under New York common law, and statutory claims under N.Y. General

3

Business Law ("GBL") §§ 349 and 349-d, which prohibit deceptive business practices. Through successive orders issued by it in 2022, the district court granted Agway's summary judgment motion in its entirety. *See Martinez v. Agway Energy Services, LLC*, No. 5:18-cv-235 (MAD/ATB), 2022 WL 306437, at *10–11 (N.D.N.Y. Feb. 2, 2022); *Martinez v. Agway Energy Services, LLC*, No. 5:18-cv-235 (MAD/ATB), 2022 WL 1091607, at *6 (N.D.N.Y. Apr. 12, 2022). Gonzales, by way of the executor of her estate,[1] now appeals the judgment entered based on these orders. She argues principally that Agway wrongfully charged customers for its EnergyGuard service and failed to charge rates "competitive" with default utility rates.

On *de novo* review, we conclude that the Agreement's plain terms permitted Agway's conduct, and that Gonzales received what she was promised. Accordingly, we AFFIRM the district court's judgment in Agway's favor.

## BACKGROUND

### I. Factual Background[2]

#### A. Regulation of Energy Supply Companies

The claims at issue arise in the context of New York's regulation (and de-regulation) of its electricity market, fields committed by law to the New York Public Service Commission ("Commission").

---

[1] After Gonzales's death in 2020, her son, Antonio Martinez, was substituted as Plaintiff. For simplicity, we use "Gonzales" to refer to the Appellant throughout the opinion.

[2] We present the facts in the light most favorable to Gonzales, the non-moving party. *See Elliott v. Cartagena*, 84 F.4th 481, 495 (2d Cir. 2023). Factual statements about the New York energy market are drawn from the class action complaint and the parties' statements of undisputed facts, filed under N.D.N.Y. Local Civil Rule 56.1.

Until 1996, residential customers in New York had no choice but to purchase electricity from their local incumbent utility—in Gonzales's case, Central Hudson.[3] In 1996, however, the Commission decided to deregulate certain aspects of the retail electricity market, aiming to promote competition and thereby to bring lower prices to retail customers. Under the regulatory scheme, third-party energy supply companies— so-called "ESCOs," of which Agway is one—are permitted to buy electricity wholesale from the local incumbent utility and resell it to customers, in theory employing innovative purchasing strategies to reduce costs and pass on savings. When a customer contracts with an ESCO, the local incumbent utility still delivers the electricity, but the ESCO deals with the customer, sets the price and receives the customer's payment, itself paying the incumbent utility for the energy delivered.

The Commission maintains supervisory authority over all ESCOs in the State of New York. *See* N.Y. Pub. Serv. L. §§ 5(1)(h), 66(1); *see generally In re Nat'l Energy Marketers Ass'n v. N.Y. State Pub. Serv. Comm'n*, 33 N.Y.3d 336, 340–42 (2019). New York's Public Service Law (abbreviated in New York as "PBS") charges the Commission

---

[3] The phrase incumbent utility is commonly used to refer to the entity that manages transmission and distribution of electricity for a particular area in the state of New York. *See How to Shop for Utility Services*, Dep't of Pub. Serv., https://dps.ny.gov/how-shop-utility-services (last visited Nov. 21, 2023). For incumbent utilities, the Commission uses an administrative "major rate case process" to approve any proposed major changes to the rates charged. *Major Rate Case Process Overview*, Dep't of Pub. Serv., https://dps.ny.gov/major-rate-case-process-overview (last visited Nov. 21, 2023). Under this process, the incumbent utility must first demonstrate the need for rate increases, considering operating expenses, taxes, and return on investments. *Id.* The Commission then conducts administrative hearings over an eleven-month period to evaluate the requested rate increases. *Id.; see also* N.Y. Pub. Serv. L. § 66(12) (setting forth the major rate case process). We take judicial notice of this procedural information posted on the Commission's website. *See Village Green at Sayville, LLC v. Town of Islip*, 43 F.4th 287, 299 n.7 (2d Cir. 2022).

with ensuring that "every electric corporation[4] . . . furnish and provide such service . . . as shall be safe and adequate and in all respects just and reasonable," and that "[a]ll charges made or demanded by any such . . . electric corporation . . . be just and reasonable and not more than allowed by law or by order of the commission." N.Y. Pub. Serv. L. § 65(1). To that end, the PBS authorizes the Commission to limit or discontinue an ESCO's access to utility distribution systems based on whether the Commission deems such access to be "just and reasonable." *Nat'l Energy Marketers Ass'n*, 33 N.Y.3d at 351; *see also* N.Y. Pub. Serv. L. §§ 5(1)(b), 65, 66.

B.      Gonzales's Agreement with Agway

Before 2016, Gonzales was a retail customer of Central Hudson, her local incumbent utility in Cornwall, New York. In January 2016, Gonzales spoke by telephone with an Agway representative, seeking to obtain her electrical service from Agway. At the start of this recorded call—referred to by the parties as a "Third-Party Verification Call" ("TPV call" and, by us, as "the enrollment call")—the representative told her that "[o]ral acceptance of Agway's offer is an agreement to initiate service and begin enrollment." App'x at 758 (transcript of enrollment call). The Agway representative explained to Gonzales that, in her first month of service, she would be charged Agway's introductory rate of $0.044 per kWh; after the end of the first month, she would "continue to receive Agway's competitive market based monthly variable rate until [she] notif[ied] Agway of [her] wish to cancel." *Id.* at 761. The representative warned that "[p]articipation in this program is not a guarantee of future savings." *Id.* According to the representative, Gonzales would also "automatically receive" Agway's

---

[4] As relevant here, the PBS defines "electric corporation" expansively to include "every corporation, company, association, joint-stock association, partnership and person, . . . owning, operating or managing any electric plant or thermal energy network." N.Y. Pub. Serv. L. § 2(13).

EnergyGuard program "that provides coverage for your center [sic] air conditioning unit and electric wiring in your home." *Id.*

Soon after the call, Agway sent Gonzales written materials confirming her enrollment and setting out detailed terms. These were a "Cover Letter," a "Residential Customer Disclosure Statement," and a brochure describing the EnergyGuard program. App'x at 766–70.[5] The Disclosure Statement reiterated the terms of Gonzales's enrollment, as set forth more generally in the enrollment call. It provided:

> The first month of the Initial Term will be at an Introductory Rate of . . . $ .044 per kWh for electricity; thereafter a monthly variable rate, to be determined at Agway's discretion, will apply.
>
> . . .
>
> The Electric Variable Rate shall each month reflect the cost of electricity acquired by Agway from all sources (including energy, capacity, settlement, ancillaries), related transmission and distribution charges and other market-related factors, plus all applicable taxes, fees, charges or other assessments and Agway's costs, expenses and margins.
>
> . . .
>
> Savings are NOT guaranteed[.]

*Id.* at 767. The Cover Letter also repeated the statement made in her enrollment call that, after the end of the promotional period, she "will receive a competitive monthly variable price." *Id.* at 766. In addition, it specified that, "[f]or being an Agway electricity customer, we also include the peace of mind and added value of Agway Energy

---

[5] The Disclosure Statement specified that, in addition to its own text, the Agreement between Agway and the customer "includes the Cover Letter and any approved addenda." *Id.* at 767. Agway now agrees that these three documents comprise its contract with Gonzales.

Services *EnergyGuard* Repair Program." *Id.* The EnergyGuard brochure enclosed with the Disclosure Statement similarly affirmed that customers would "automatically receive all of the benefits of" EnergyGuard, *id.* at 769, which provided "[u]p to $1,000 each calendar year in covered parts and labor" as needed to repair covered damage to central air conditioning units, and up to another $1,000 in covered repairs to electric lines in the customer's home, *id.* at 770.

Gonzales's use of Agway-supplied electricity began in February 2016, and she was charged the promised promotional rate—$0.044 per kWh—in both February and March of that year. Starting in April 2016, Agway set rates for her electricity anew each month, initially charging her $0.08605 per kWh. From April 2016 through December 2017, Agway's variable rate was consistently 1 to 6 cents per kWh higher than Central Hudson's retail rate for the same period. Gonzales canceled her service with Agway in late 2017 and returned to Central Hudson as her electricity supplier.

## II.     Procedural Background

On December 6, 2017, Gonzales filed a class action complaint against Agway in the United States District Court for the District of Delaware. She alleged that during the period of her enrollment Agway wrongfully incorporated the costs of EnergyGuard into its variable rates and failed to charge the promised "competitive" prices. Through these actions, she asserted, Agway violated GBL §§ 349, 349-d; breached the Agreement; breached the implied covenant of good faith and fair dealing under New York law; and was unjustly enriched. As to the common law claims, Gonzales sought to represent a class of all New York and Pennsylvania Agway customers who paid the variable rate for residential electricity services; as to the New York statutory claims, she sought to represent a subclass of Agway's New York customers. On the parties' stipulation, the case was soon transferred to the Northern District of New York.

8

In 2018, the district court dismissed Gonzales's claims for unjust enrichment and breach of the implied covenant of good faith and fair dealing under Federal Rule of Civil Procedure 12(b)(6), concluding that they were duplicative of the contract claim. *Gonzales v. Agway Energy Services, LLC*, No. 5:18-cv-235 (MAD/ATB), 2018 WL 5118509, at *4–5 (N.D.N.Y. Oct. 22, 2018).[6] After discovery and further proceedings, the court in 2022 granted Agway summary judgment as to the breach of contract claim. The court construed the Agreement as permitting Agway to include the disaggregated costs of its EnergyGuard program in its variable rate. *Martinez*, 2022 WL 306437, at *10. The court further held that Gonzales did not create a triable issue of fact merely "by showing that Defendant's rates are not 'competitive' compared solely against those of the incumbent utilities." *Id.* Giving similar reasons, the district court in a separate order also granted summary judgment to Agway as to the GBL claims. The court reasoned that it would be "logically inconsistent" to hold that no triable issue of fact remained as to whether Agway's variable rate was "competitive" or "market-based," but to allow Gonzales to proceed with GBL claims that required her to "establish that those very same terms were materially misleading to a reasonable consumer." *Martinez*, 2022 WL 1091607, at *5.

This appeal followed.

## DISCUSSION

On appeal, Gonzales challenges the district court's grant of summary judgment to Agway on her breach of contract and GBL claims. We review a district court's summary judgment grant *de novo*, construing the evidence in the light most favorable to

---

[6] Gonzales does not appear to be challenging this ruling, as she fails to develop any argument concerning the district court's Rule 12(b)(6) ruling in her briefs. Accordingly, we affirm the district court's dismissal of those claims.

the non-moving party and drawing all reasonable inferences in that party's favor. *Bey v. City of New York*, 999 F.3d 157, 164 (2d Cir. 2021). Summary judgment is appropriate only if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant bears the burden of "demonstrat[ing] the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). For the following reasons, we AFFIRM the district court's judgment.

## I.      Breach of Contract Claim

The parties agree that the Agreement is governed by New York law. To prevail on a breach of contract claim under New York law, a plaintiff must show that "(1) a contract exists; (2) plaintiff performed in accordance with the contract; (3) defendant breached its contractual obligations; and (4) defendant's breach resulted in damages." *34-06 73, LLC v. Seneca Ins. Co.*, 39 N.Y.3d 44, 52 (2022) (internal citations omitted); *see also Moreno-Godoy v. Kartagener*, 7 F.4th 78, 85 (2d Cir. 2021) (same). Only the third of these factors is at issue here: whether Agway breached its contractual obligations.

Summary judgment on a contract claim is appropriate "only when the contractual language . . . is found to be wholly unambiguous and to convey a definite meaning." *Topps Co. v. Cadbury Stani S.A.I.C.*, 526 F.3d 63, 68 (2d Cir. 2008). We will find a contract unambiguous "if the language it uses has a definite and precise meaning, as to which there is no reasonable basis for a difference of opinion." *Lockheed Martin Corp. v. Retail Holdings, N.V.*, 639 F.3d 63, 69 (2d Cir. 2011). Whether contract terms are unambiguous presents "a question of law that is resolved by reference to the contract alone." *O'Neil v. Ret. Plan for Salaried Emps. of RKO Gen., Inc.*, 37 F.3d 55, 59 (2d Cir. 1994) (internal quotation marks omitted). When a contract contains "definitive, particularized" language, that language "takes precedence over expressions of intent

10

that are general, summary, or preliminary." *Rabin v. Mony Life Ins. Co.*, 387 Fed. App'x 36, 40 (2d Cir. 2010) (quoting *John Hancock Mut. Life Ins. Co. v. Carolina Power & Light Co.*, 717 F.2d 664, 669 n.8 (2d Cir. 1983).

As explained above, Gonzales's agreement with Agway consisted of the Cover Letter, Disclosure Statement, and EnergyGuard brochure that she was sent soon after her enrollment call.[7] The Agreement promised that Gonzales would be charged $0.044 per kWh for her first month of service, and thereafter a "monthly variable rate, to be determined at Agway's discretion." App'x at 767. It described this monthly variable price as "competitive," *id.* at 766, and explained that the variable monthly rate would reflect "the cost of electricity acquired by Agway from all sources (including energy, capacity, settlement, ancillaries), related transmission and distribution charges and other market-related factors, plus all applicable taxes, fees, charges or other assessments and Agway's costs, expenses and margins," *id.* at 767. The Agreement cautioned that savings were "NOT guaranteed." *Id.* "For being an Agway electricity customer," Agway also promised "automatically" to "include the peace of mind and added value of" EnergyGuard. *Id.* at 766.

Gonzales claims that Agway's monthly variable rate violated the terms of the Agreement. Although she acknowledges that the Agreement allowed Agway to use its discretion to set the monthly variable rate, she argues that Agway's discretion was limited by its representations that it would charge rates that were "competitive" and "based on market costs," and that it failed to do so. Appellant's Br. at 33. Second, she argues that Agway breached the Agreement by charging customers for the EnergyGuard service after leading them to believe the service was included at no cost.

---

[7] Gonzales does not argue that the exchange recorded on the enrollment call was part of the Agreement.

*Id.* On review, we conclude that the plain meaning of the Agreement's terms regarding how Agway would set the post-promotion variable monthly rate leaves no triable issue of fact as to whether Agway was in breach under either theory: it was not.

A. Agway was entitled to consider more than its procurement costs when using its discretion to set monthly variable rates.

As with other types of breach of contract claims, courts in this Circuit evaluate claims arising from energy services agreements on a case-by-case basis. The dispositive questions are whether an agreement entitled the energy services provider to use discretion in setting its rates and, if so, how the agreement cabined that discretion. *See, e.g., Congregation Yetev Lev D'Satmar, Inc. v. Engie Power & Gas, LLC*, No. 1:22-cv-04844-NRM-RER, 2023 WL 4674273, at *3 (E.D.N.Y. July 21, 2023) ("Subsequent cases in this Circuit with alleged breaches of ESCO contracts have turned on how—if at all—a contract describes how an ESCO will determine its variable rate.").

In *Richards v. Direct Energy Services, LLC*, 915 F.3d 88, 96 (2d Cir. 2019), for example, we affirmed the district court's grant of summary judgment to an ESCO after the plaintiff sued for breach of contract and related claims. The plaintiff, Richards, had signed an electricity supply agreement with Direct Energy that guaranteed him a fixed rate of $0.0745 per kWh for one year, after which Direct Energy would begin charging a rate that would "be variable each month at Direct Energy's discretion." *Id.* at 94. The relevant agreement provided that this variable rate "may be higher or lower each month based upon business and market conditions." *Id.*

Richards chose to continue his agreement with Direct Energy past the one-year promotional period, and for three months thereafter he paid its variable rate. *Id.* at 95. During those three months, Direct Energy's rate was consistently $0.0236 per kWh

12

higher than the "Standard Service Rate" set by Connecticut's Public Utilities Regulatory Authority for the state's two regulated-rate electricity distribution systems. *Id.* at 95.[8]

In affirming the grant of summary judgment to Direct Energy, we concluded that the contract unambiguously entitled Direct Energy to consider the objectives reflected in the record—"achiev[ing] a target profit margin, match[ing] competitors' prices, and reduc[ing] customer losses"—and that although Direct Energy was bound to "exercise [its] discretion in good faith," Richards had not offered any evidence that it failed to do so. *Id.* at 98–99 (internal quotation marks omitted). Accordingly, we held that "Direct Energy did not evade the spirit of the contract or frustrate Richards's justified expectations" when it exercised its contractually provided "discretion to set the variable rate based upon business and market conditions." *Id.* at 98 (internal quotation marks omitted).

In *Mirkin v. XOOM Energy, LLC,* 931 F.3d 173 (2d Cir. 2019), on the other hand, we reversed a district court's dismissal of breach of contract and other claims against another New-York-operating ESCO: XOOM Energy, LLC ("XOOM"). There, the relevant agreement did not describe the monthly variable rate as being set according to

_____

[8] *Richards* arose in the context of Connecticut's electricity market, rather than New York's, *see Richards*, 915 F.3d at 93, but the regulatory schemes in both states resemble each other closely enough that our reasoning there appropriately bears upon our result here. Connecticut's electricity market was deregulated in 2000, meaning that while local utilities still "maintain[ed] monopoly control over electricity distribution systems," private retail electricity suppliers (such as defendant Direct Energy) could "piggyback on [local] electricity distribution systems" and "sell to consumers at market-based, unregulated rates." *Id.* Much like ESCOs in New York, private suppliers in Connecticut were allowed to offer variable prices, promotional rates, or renewably sourced electricity to entice new customers. *See id.* But the Public Utilities Regulatory Authority ("PURA")—Connecticut's analogue to New York's Commission—still maintained supervisory authority over these suppliers. *See id.* PURA licensed them, periodically reviewed their licenses, and policed how consumer contracts were worded. *Id.* The private suppliers' rates, however, were not regulated. *Id.*

the ESCO's discretion. Rather, it stated that the plaintiffs would pay a monthly variable rate "based on XOOM's actual and estimated supply costs which may include but not be limited to prior period adjustments, inventory and balancing costs." *Id.* at 175. We concluded that the plaintiffs had plausibly alleged a breach because both their originally filed complaint and their proposed amended complaint alleged that XOOM's rates over time "showed significant upward deviations from the Market Supply Cost and continued to rise even when that cost fell," despite XOOM's promise to base its rates on "actual and estimated supply costs." *Id.* at 177, 175.

The difference between the contractual language in *Mirkin* and that in *Richards* was "critical[]" to our decision to reverse in *Mirkin*. *Id.* at 178 n.3. While the Mirkins' contract "required XOOM to base its variable rates on its supply costs . . . the contract in *Richards*, by its plain terms, imposed no such requirement; the relevant provision there made no mention of procurement costs." *Id.*

Here, Gonzales argues that her agreement with Agway is more like the agreement in *Mirkin* than the one at issue in *Richards*.[9] More specifically, she argues that

---

[9] Gonzales also contends that *Richards* does not apply here, reasoning that "*Richards* rejected a plaintiff's assertion that, to satisfy its implied duty of good faith and fair dealing, an ESCO must charge a rate *equal to, or lower than*, a utility's rate," something Gonzales does not assert here. Appellant's Br. at 39, 44. In Gonzales's view, *Richards*'s applicability is limited to claims that ESCOs' rates are capped by incumbent utility rates. We do not read *Richards* so narrowly.

Richards's allegations resembled those at issue here, and in large part relied on evidence that "the variable rate stayed constant while procurement costs fluctuated from the winter of 2013–2014 through August 2015." *Richards*, 915 F.3d at 97. Richards's argument was thus much broader than Gonzales suggests: Richards's claim for breach of the implied covenant of good faith and fair dealing rested on his assertion that "a reasonable consumer would understand [Direct Energy's] contract language to mean that the variable rate would fluctuate with Direct Energy's procurement costs." *Id.* (cleaned up). Accordingly, our decision turned on our view that the contract allowed Direct Energy to consider various "business and market conditions," including its own profit margins, when setting its rates, and that these factors would not necessarily fluctuate in parallel with market costs. *See id.* at 97–98. The same is true here.

14

because "[default] utility rates serve as a reasonable proxy for market costs," and because there were "significant discrepancies between Defendant's rates and [default] utility rates, as well as instances where Defendant's rates d[id] not rise or fall as market costs r[o]se and f[e]ll," Agway must have breached its promise to base its variable rates on "its procurement costs or other market-related factors." Appellant's Br. at 35–36. We disagree.

First, Gonzales's agreement with Agway did not promise that its price-setting discretion would be limited to its procurement costs. To be sure, Gonzales's agreement with Agway referenced procurement costs when it stated that the variable rate "shall each month reflect the cost of electricity acquired by Agway from all sources." App'x at 767. But procurement costs were only one among several named factors, including unspecified "market-related factors" that the Agreement gave Agway "discretion" to consider when setting its monthly variable rate. *Id.*; *see also Brown v. Agway Energy Servs., LLC,* 822 Fed. App'x 100, 103 (3d Cir. 2020) (affirming district court's dismissal of breach of contract claims based on substantially similar language in Agway's contract). Unlike in *Mirkin*, language promising that the monthly variable rate would be based solely "on [the energy service provider's] actual and estimated supply costs," is nowhere to be found in Gonzales's agreement with Agway. *Cf. Mirkin*, 931 F.3d at 175.

Second, it is not clear to us that the term "market-related factors" in the Agreement is synonymous with and limited to market costs such as the cost of procuring energy. In *Richards*, for example, we appeared to interpret the similar term "business and market conditions" to embrace considerations like reducing customer losses, achieving target profit margins, and matching competitors' rates. 915 F.3d at 98. But Gonzales's breach of contract claim would fail even if we were to agree that Agway's discretion to consider "market-related factors" allowed it only to consider

15

"market costs," because the Agreement also expressly permitted Agway to consider its "costs, expenses and margins" when setting prices. App'x at 767.

Gonzales does not argue that Agway considered factors other than its procurement costs, market-related factors, and its costs, expenses, and margins when setting its variable rates. Unlike the defendant in *Mirkin*, Agway has pointed to several factors expressly listed in the Agreement that can explain the differences between Agway's rates and the cost of obtaining electricity from the default utility during the relevant period. *Compare* Appellee's Br. at 5, *and* App'x 775–78, *with Mirkin*, 931 F.3d at 177 (explaining that XOOM "failed, in its briefs and at oral argument, to cast doubt on the plausibility of [the Mirkins'] allegations" by explaining the "substantial deviations" between its rates and the Market Supply Cost).

In sum, the plain language of the Agreement permitted Agway to consider factors beyond its procurement costs when setting its monthly variable rates. Accordingly, no genuine dispute of material fact remains as to whether Agway breached its obligations to Gonzales when it set its rates based on factors like its costs, expenses, and margins.

B.      The Agreement entitled Agway to include the cost of EnergyGuard in its monthly variable rate.

As explained above, Agway was entitled to consider its "costs, expenses and margins," when setting rates, as long as it considered those factors in good faith. App'x at 767; *Richards*, 915 F.3d at 99. Accordingly, it was entitled to include the cost of providing its EnergyGuard program in its monthly variable rate.

Gonzales argues otherwise, contending that the Agreement bars any charge for the EnergyGuard service, whether disaggregated or rolled into the final electricity charge, because the Agreement implies that EnergyGuard will be provided for free. Appellant's Br. at 48–51. In urging this approach, she relies principally on the Cover

16

Letter, which states, "For being an Agway electricity customer, we also include the peace of mind and added value of Agway Energy Services *EnergyGuard* Repair Program."[10] App'x at 766. Gonzales also stresses Agway's representation that EnergyGuard would be included "automatically" and the fact that EnergyGuard is not included by name in the list of factors that Agway is entitled to consider when setting its variable rate. Appellant's Br. at 49–50.

We read the Agreement differently. The plain terms of the Cover Letter say only that EnergyGuard is included with Agway's services. The attached EnergyGuard brochure, too, says only that Agway customers "automatically receive all the benefits of" EnergyGuard. App'x at 769. Nothing in the Agreement promised that Agway would absorb the cost of EnergyGuard, or that the cost of EnergyGuard was not among the "costs, expenses and margins" that Agway explicitly stated it would consider in setting the variable monthly rate. *See id.* at 767; *see also Brown*, 822 Fed. App'x at 103 ("Further, the provision makes clear that Agway can consider its own 'costs, expenses, and margins' in setting prices. One obvious cost is Agway's EnergyGuard service.").

Gonzales urges that, even if Agway was permitted to charge in some way for EnergyGuard, Agway's "variable rate could only include an amount reflective of EnergyGuard's actual costs." Appellant's Br. at 50–51. Again, Gonzales points to nothing in the Agreement or our precedent that supports this contention. For the reasons already stated, Agway's "discretion" to set its variable monthly rate based on, among other factors, its "costs, expenses and margins," allowed it to charge some

---

[10] Gonzales urges that her interpretation is further supported by a *proposed* script for customer service representatives (produced by Agway in response to document requests during the Commission's proceedings). She does not suggest, however, that this proposed script was part of the contract she had with Agway, nor that any Agway representative ever read this script to her. We therefore have no reason to consider it.

amount beyond its actual costs to operate EnergyGuard, so long as it exercised that discretion in good faith. App'x at 767; *see Richards*, 915 F.3d at 99.

C. Gonzales has not raised a triable issue of fact as to whether Agway exercised its discretion in bad faith.

While Gonzales appears to argue that Agway acted in bad faith when it included in its rates what she terms "an exorbitant charge for EnergyGuard, unrelated to its actual costs," Appellant's Br. at 51, she has failed to raise a triable issue of fact that it acted in bad faith.

In support of her argument, Gonzales points to the proffered testimony of an expert witness, Dr. Frank Felder. *Id.* In his expert report, Dr. Felder calculated the "value" of EnergyGuard to customers and compared it with the cost of EnergyGuard according to one of Agway's experts. App'x at 510–11. Dr. Felder then subtracted EnergyGuard's purported value from his previous "overcharge calculations," which were based on comparisons between the cost of electricity from Agway and the cost of electricity from default utilities. *Id.* at 511. But Dr. Felder calculated these "overcharge[s]" based on his subjective and unsupported view of what a "reasonable margin" would have been. *See id.* at 347; 512.

The district court concluded that Dr. Felder's report was inadmissible under Federal Rule of Evidence 702, because his conclusions about the overcharges were based on "unreliable methodology and insufficient data"—namely, his subjective views on the reasonableness of margins and the unsupported contention "that the proper comparison for [Agway's] variable rate is solely the rates of the incumbent utilities." *Martinez*, 2022 WL 306437, at *14.

It was not "manifestly erroneous" for the district court to exclude Dr. Felder's report. *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 265 (2d Cir. 2002) (internal quotation marks omitted). As explained above and below, the proffered comparisons

18

between Agway's prices and those of the default utilities are legally insufficient—without more, and in light of the Agreement's express terms—to raise a triable issue of fact as to Gonzales's breach of contract and GBL claims. And contrary to Gonzales's argument that the EnergyGuard-related portions of Dr. Felder's report should not have been excluded because they "ha[d] nothing to do with [default] utility rates," Appellant's Br. at 54, Dr. Felder calculated the "value" of EnergyGuard for the specific purpose of subtracting that number from his legally insufficient overcharge calculations. App'x at 511. It was not an abuse of discretion for the district court to exclude his EnergyGuard-related calculations with the rest of the report.

Gonzales does not point to any other evidence that would raise a triable issue of fact as to whether Agway exercised its discretion in bad faith. The same was true in *Richards*, where we concluded that the plaintiff had not raised a triable issue of fact as to bad faith because he merely argued that prices were "too high" without providing any evidence that they were any higher than competing ESCOs' rates. 915 F.3d at 99.[11] Indeed, the language of the Agreement between Gonzales and Agway makes this case clearer than *Richards*. The contract at issue in *Richards* did not define "business and market conditions," leading Judge Pooler to express the view, in her partial dissent, that

---

[11] *Richards* interpreted and applied the analogous implied covenant of good faith and fair dealing that arises under Connecticut law. Much as it does under New York law, Connecticut's implied covenant of good faith and fair dealing attaches to every contract and "requires that neither party do anything that will injure the right of the other to receive the benefits of the agreement." *Richards*, 915 F.3d at 97 (internal quotation marks and alterations omitted) (quoting *Renaissance Mgmt. Co. v. Conn. Hous. Fin. Auth.*, 281 Conn. 227, 240 (2007)). To prevail on a claim for breach under Connecticut law, the plaintiff must show that the defendant's "allegedly wrongful acts were 'taken in bad faith.'" *Id.* (quoting *De La Concha of Hartford, Inc. v. Aetna Life Ins. Co.*, 269 Conn. 424, 433 (2004). This "in general implies both actual or constructive fraud, or a design to mislead or deceive another, or a neglect or refusal to fulfill some duty or some contractual obligation, not prompted by an honest mistake as to one's rights or duties, but by some interested or sinister motive." *Id.* (internal quotation marks omitted).

a reasonable customer could interpret the term to include only "those conditions that affect Direct Energy's costs of providing electricity," such as "fixed costs of labor, facilities, legal representation . . . and the more variable cost of purchasing electricity and electricity derivatives. *Id.* at 111 (Pooler, J., dissenting in part). Based on evidence that Direct Energy "raised variable-rate prices to recoup anticipated losses among fixed-rate customers, and . . . smoothed variable-rate prices so that customers would not notice how high they were getting," Judge Pooler saw a triable issue of fact as to "whether Direct Energy's reasons [for setting its variable rate] amounted to bad faith or a breach of the contract given the letter and spirit of the contract." *Id.* at 112.

Here, on the other hand, Agway's contract with Gonzales expressly stated that Agway could consider its "costs, expenses and margins" when setting its rates. App'x at 767. Further, Agway specified that "[s]avings are NOT guaranteed" and made no representations that its prices would always be lower than those of the incumbent utilities, for example. *Id.* Agway (like Direct Energy) provided "exactly what [Gonzales] bargained for: after paying a fixed rate below the [default utility rate] for a fixed time, [Gonzales] would pay a variable rate set at [Agway's] discretion." *See Richards*, 915 F.3d at 99. In doing so, it did not breach its contract.

    D.    <u>Agway's representation that its rate would be "competitive" does not alter our analysis.</u>

Gonzales also argues that Agway breached the Agreement by failing to honor a promise to provide "competitive" rates. Appellant's Br. at 35. In support, she relies on the same information discussed above: price comparisons that show "sharp discrepancies between Defendant's rates and rates charged by [default] utilities" during Gonzales's two-year enrollment period. *Id*. She contends that the incumbent utilities are Agway's main competitors, and accordingly suggests that consistently unfavorable comparison of Agway's unregulated rates with incumbent utility rates suffices to

establish that Agway breached the Agreement by setting rates that were not "competitive." *Id.* at 35–36.

We are not persuaded. First, "competitive" is a broad and general term that is not defined in the Agreement. *See* App'x at 766–70. The portions of the Agreement listing factors that Agway may consider when exercising its rate-setting discretion, on the other hand, are significantly more specific. Under "fundamental rule[s] of contract construction . . . specific words will limit the meaning of general words if it appears from the whole agreement that the parties' purpose was directed solely toward the matter to which the specific words or clause relate." *Global Reinsurance Corp. of Am. v. Century Indemnity Co.*, 22 F.4th 83, 97 n.7 (2d Cir. 2021) (internal quotation marks omitted); *see also Lockheed Martin Corp.*, 639 F.3d at 69 ("If the document as a whole makes clear the parties' over-all intention, courts examining isolated provisions should then choose that construction which will carry out the plain purpose and object of the agreement.") (internal quotation marks omitted and alteration adopted).

Here, the whole agreement between Agway and Gonzales makes it apparent that the parties intended to contract for energy services on financial terms governed by the more specific language giving Agway discretion to set prices based on listed factors. *See* App'x at 767. Indeed, Gonzales has not explained what she understands "competitive" to mean. Without a satisfactory definition of "competitive," any contractual promise to charge a competitive rate lacks the definiteness that New York law requires to make it enforceable. *Cf. Gutkowski v. Steinbrenner*, 680 F. Supp. 2d 602, 611–12 (S.D.N.Y. 2010) (collecting cases holding that vague and generalized promises like those for "fair compensation," "substantial income," or "market rate" are insufficiently definite).

Second, even if we agreed with Gonzales that the Agreement promised a "competitive" rate, it is not obvious to us which energy services companies Agway was promising to compete against when setting its rates. Gonzales argues that the

incumbent utilities provide the proper comparators. Appellant's Br. at 35. Agway argues that it should be understood as competing against the other ESCOs—particularly because ESCOs are regulated differently than incumbent utilities. Appellee's Br. at 5–7. The plausibility of each interpretation serves only to underscore the vagueness of the reference to "competitive" rates.

Third, Agway presented expert evidence comparing its variable rates to rates offered by other ESCOs in territories where Agway operated, for each quarter from 2014 to 2019. This comparison showed that in ninety-eight percent of the surveyed periods, Agway's variable rate was lower than the median variable rate offered by other ESCOs for electricity alone (without any additional energy-related product like EnergyGuard). Accordingly, Gonzales cannot argue that Agway failed to set rates that were competitive with other ESCOs. Instead, her counsel emphasized at oral argument that Agway's rates were "sixty percent higher" than those of the incumbent utility. Oral Arg. Audio at 50:41–45. According to Gonzales's complaint, however, Agway's rate was not consistently sixty percent higher than Central Hudson's during the Agreement period; rather, it varied between 0.3145% and 134.6939% higher than Central Hudson's rate during that time.

Taking the above points together, we conclude that Gonzales failed to raise a triable issue of fact as to whether Agway made an enforceable promise as to the competitiveness of its rate levels.

We do not suggest, however, that energy services companies have carte blanche to charge their customers any rate they wish, so long as they reserve rate-setting discretion in their contracts. As discussed above, and as we have held before, energy services companies must exercise their rate-setting discretion in "good faith." *Richards*, 915 F.3d at 99.

22

Energy services companies also remain accountable to the Commission. Notably, around the same time that Gonzales was contracting with Agway for energy services, the Commission acknowledged that the New York retail energy market was "not providing sufficient competition or innovation to properly serve consumers," and that [c]ommodity price differentiation has not worked." *Notice of Evidentiary and Collaborative Tracks and Deadline for Initial Testimony and Exhibits*, at 3, State of N.Y. Pub. Serv. Comm'n, Case 15-M-0127, et al. (issued December 2, 2016). It initiated a multi-year process to re-evaluate the market, after which the Commission issued an order that prohibited ESCOs from "offering variable-rate, commodity-only service except where the offering includes guaranteed savings" over incumbent utilities on a year-over-year basis. App'x at 1036, 1072–75 (Commission's Dec. 2019 Order). The 2019 Order included a few exceptions, including one that provided Agway, by name, a "limited opportunity" to continue offering variable-rate service without guaranteed savings, in light of "the specific, credible evidence Agway submitted regarding the energy-related value of [EnergyGuard]." *Id.* at 1056.[12]

\*　　\*　　\*

In summary, the Agreement's language leaves no doubt that Agway's pricing decisions were permissible. Gonzales has not established a breach of contract by showing that Agway considered its costs, margins, and expenses—including the costs of (and profits from) EnergyGuard—in setting its monthly variable rate, nor by showing

---

[12] Gonzales argues that the Commission's 2019 Order bears on her claims because it reflects a public policy judgment that ESCOs like Agway must compete against—and guarantee savings over—default utilities. Appellant's Br. at 16–17, 46–47. This argument fails for two simple reasons. First, such a public policy did not prevail until the Commission announced its new ESCO rules in 2019—more than three years after Gonzales contracted with Agway. Second, any public policy that the 2019 Order might have communicated did not extend to Agway, which was expressly exempted from the new guaranteed savings requirement. App'x at 1056.

that Agway failed to charge rates comparable to those charged by the incumbent local utilities, rather than other ESCOs. As a matter of law, the Agreement's language dooms these theories. The district court therefore correctly granted summary judgment to Agway. *See Topps*, 526 F.3d at 68 (summary judgment is appropriate if contractual language is "wholly unambiguous"). Indeed, a contrary result would risk turning courts into rate-setting agencies treading on the Commission's mandate, an untenable outcome.

## II.    GBL claims

Section 349 of New York's GBL outlaws "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state." N.Y. Gen. Bus. L. § 349(a). Section 349-d specifies that "[n]o person who sells or offers for sale any energy services for, or on behalf of, an ESCO shall engage in any deceptive acts or practices in the marketing of energy services." *Id.* § 349-d(3). "To state a claim for a § 349 violation, 'a plaintiff must allege that a defendant has engaged in (1) consumer-oriented conduct that is (2) materially misleading and that (3) plaintiff suffered injury as a result of the allegedly deceptive act or practice.'" *Nick's Garage, Inc. v. Progressive Cas. Ins. Co.*, 875 F.3d 107, 124 (2d Cir. 2017) (quoting *City of New York v. Smokes-Spirits.com, Inc.*, 12 N.Y.3d 616, 621 (2009)). "'Whether a representation or an omission, the deceptive practice must be likely to mislead a reasonable consumer acting reasonably under the circumstances.'" *Id.* (quoting *Stutman v. Chem. Bank*, 95 N.Y.2d 24, 29 (2000)).

Gonzales argues that issues of fact remain as to whether Agway engaged in deceptive practices, asserting that (1) Agway falsely represented that its variable rate would be competitive and based on market costs, and (2) Agway charged for EnergyGuard even though statements in the Cover Letter and enrollment call, along

with the absence of EnergyGuard from the definition of Agway's variable rate, can all be construed to mean that EnergyGuard would be provided free of charge.

But having ruled above that the Agreement unambiguously permitted Agway to exercise its discretion to incorporate its costs, expenses, and margins into its monthly variable rate, we also find no triable issue of fact as to whether the Agreement's language would "be likely to mislead a reasonable consumer" on these two issues. *See id.* Therefore, we affirm the grant of summary judgment to Agway as to Gonzales's GBL claims.

## CONCLUSION

For the foregoing reasons, the district court's judgment is **AFFIRMED**. [13]

---

[13] Because we affirm the grant of summary judgment to Agway on all of Gonzales's claims, we also affirm the district court's dismissal of Gonzales's class certification motions as moot. Agway argues, without having cross-appealed, that the district court erred in initially granting class certification to the New York subclass and proposes that Martinez—as executor of his mother's estate—is not an adequate class representative in any event. Without a conditional cross-appeal, however, an appellee "may not advance a theory that challenges some aspect of the lower court's judgment." *See Pacific Capital Bank, N.A. v. Connecticut*, 542 F.3d 341, 349 (2d Cir. 2008). In any case, because we hold that none of Gonzales's claims survives summary judgment, Agway's arguments regarding class certification are moot.